**IN RE: TUTU WELLS CONTAMINATION LITIGATION, RHODA
J. HARTHMAN, et al., Plaintiffs**

**v.**

**TEXACO, INC., et al., Defendants**

**ESSO STANDARD OIL, S.A., LTD., et al., Third-Party Plaintiffs**

**v.**

**LAGA INDUSTRIES, LTD., et al., Third-Party Defendants**

**FOUR WINDS PARTNERSHIP, Plaintiff**

**v.**

**TEXACO CARIBBEAN, INC., et al., Defendants**

**ESSO STANDARD OIL, S.A., LTD., Counter-claimant and
Third-Party Plaintiff**

**v.**

**LAGA INDUSTRIES, LTD., et al., Third-Party Defendants**

Master Docket File No. 1989-107,

Civil No. 89-220, 89-224

District Court of the Virgin Islands

Div. of St. Thomas and St. John

March 20, 1995

251

RICHARD R. KNOEPFEL, ESQ., (BRIGGS, KNOEPFEL & RONCA), St. Thomas, V.I. and THOMAS H. HART, III, ESQ., (ALKON, RHEA & HART), Christiansted, St. Croix, V.I., *for PID-Harthmans*

JOHN K. DEMA, ESQ., CAREY-ANNE MOODY, ESQ., (JOHN K. DEMA, P.C.), Christiansted, St. Croix, V.I. and DARREN DEFOE, ESQ., Waterford, Maine, *for Four Winds Plaza Partnership*

ADDISON J. MEYERS, ESQ., MARY HOERBER, ESQ., (LAW OFFICES OF O'CONNOR & LEMOS), Coral Gables, Florida and EDGAR CHRISTENSEN, ESQ., (LAW OFFICES OF R. ERIC MOORE), Christiansted, St. Croix, V.I. *for Texaco, Inc., Texaco Caribbean, Inc.*

ROBERT T. LEHMAN, ESQ., DEBRA ROSEN, ESQ., WILLIAM J. O'KANE, ESQ., CHRISTOPHER GIBSON, ESQ., (ARCHER & GREINER), Haddonfield, New

Jersey and Douglas L. Capdeville, Esq., Christiansted, St. Croix V.I., *for Esso Standard Oil, S.A., Ltd., Esso Virgin Islands, Inc., and Esso Standard Oil, Co. (P.R.)*

Richard E. Daley, Esq., (Law Offices of Pattie & Daley), Christiansted, V.I. and E. Barclay Cale, Jr. (Co-Counsel), Thomas A. Dye, Esq., (Morgan, Lewis & Bockius), Miami, Florida, *for Exxon Corporation*

John A. Zebedee, Esq., (Law Offices of James L. Hymes), Charlotte Amalie, St. Thomas, V.I. *for Vernon Morgan*

Francis E. Jackson, Jr. Esq., St. Thomas, V.I. *for Daniel Bayard*

Carol Ann Rich, Esq., (Campbell, Arellano & Rich), St. Thomas, V.I., *for Ramsay Motors, Inc.*

Nancy D'Anna, Esq., Cruz Bay, St. John, V.I. and Patricia Martinez Lorenzo, Esq., Hato Rey, Puerto Rico, *for L'Henri, Inc.*

Richard G. Leland, Esq. (Co-Counsel), (Law Offices of Rosenman & Colin), New York, New York and Kevin A. Rames, Esq., Christiansted, St. Croix, V.I., *for Paul Lazare, Andreas Gal, The Duplan Corp., Laga Industries, Ltd., Panex Industries, Inc., and Panex Co.*

John R. Coon, Esq., (Law Office of John R. Coon), Gallows Bay, St. Croix, V.I., *for Western Auto*

Ralda V. Simmonds, Esq., Charlotte Amalie, St. Thomas, V.I., *for Virgin Islands Housing Authority*

George Marshall Miller, Esq., St. Thomas, V.I., *for Thomas A. Gassett, G.S. Industries, Inc.*

Rosalie Simmonds Ballantine, Esq., Attorney General for the Virgin Islands, By: Henry Thomas, Assistant Attorney General, Virgin Islands Department of Justice, St. Thomas, V.I., *for V.I. Department of Education*

Katherine E. Harsch, Esq., (Bornn, Bornn, Handy & Rashid), Charlotte Amalie, St. Thomas, V.I., *for Siegfried Torinus and Waltrad Torinus*

Daniel Riesel, Esq., (Sive, Paget & Riesel, P.C.), New York, New York

Edward H. Jacobs, Esq., (Jacobs & Brady), Christiansted, St. Croix V.I., *for Law Firm of Goldman, Antonetti*

Joel H. Holt, Esq., Christiansted, St. Croix, V.I., *for Eugenio C. Romero, Esquire*

Britain H. Bryant, Esq., (Bryant, White & Associates, PC), Christiansted, St. Croix, V.I., *for Warren B. Cole, Esquire.*

BROTMAN, *Judge*

## MEMORANDUM OPINION AND ORDER

Pending before this court are several motions requesting sanctions, including monetary awards, dismissal of counter-claims and cross-claims, and other relief because of various acts of alleged discovery misconduct among the Esso Defendants and their counsel.

### I. THE JANUARY 15, 1993 ORDER

The first series of motions for sanctions, relating to failure of the Esso Defendants to obey a discovery Order of the Magistrate, were submitted to the Honorable Geoffrey Barnard, United States Magistrate Judge (hereinafter "Magistrate"), for Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1). The Magistrate found sanctions to be warranted, and acknowledged his dismay that the discovery did not proceed according to his Order of January 15, 1993. The Magistrate concluded that "while testimony was presented by the plaintiff which could be construed to suggest that counsel [for the Esso interests] obstructed the investigation, . . . . their efforts, if anything, *were out of zealous defense of their clients and not willful, malicious, or contumacious disregard of the court.*" (Emphasis added.) Though no objections to the Magistrate's factual findings were filed, several parties filed objections to the Magistrate's conclusion that the actions taken by Counsel for Esso were not willful, and in bad faith, but merely out of "zealous defense." For the following reasons, this court disagrees with the Magistrate's characterization of the conduct of former counsel for the Esso Defendants, and finds that the failure to obey the mandate of the Order and permit discovery was willful and in bad faith.

On January 15, 1993, the Magistrate entered an Order in these consolidated cases regarding the site assessment and inspection of a certain Esso Virgin Islands, Inc., property on St. Thomas, the Esso Tutu Service Station ("ETSS"), one alleged source of the contaminants found on the Plaintiffs' properties. As the Magistrate noted in his Report and Recommendation, "the Order entered by the court was the culmination of months of discussion, planning, and hearings on this topic the site assessment and inspection."[1] R&R at p.3.

The parties' awareness and knowledge of the importance of the inspection that was the subject matter of the January 15, 1993 Order is well-documented and is noted by the Magistrate in his Report and Recommendation. Indeed, Plaintiff Four Winds avers in its February 5, 1993 "Motion for An Order of Contempt, Dismissal of the ESSOVI Counterclaim and Affirmative Defenses and Other Sanctions," that "the proposed Order had been published to all counsel on December 1, 1992, and that ESSOVI had raised no objection."[2] Four Winds Motion For An Order of Contempt, Dismissal of the ESSOVI Counterclaim and Affirmative Defenses and Other Sanctions, at p. 5. Moreover, the scope of the investigation was one of three topics discussed during a hearing before the Magistrate on January 13, 1993.

It is apparent from a review of the transcript of the January 13, 1993 hearing that the Magistrate intended that the inspection was to be conducted in good faith (1) to determine to a degree of certainty the presence or absence of an anomaly; and (2) to perform pipe tracing to locate and investigate the ingress and egress pipes from the oil/water separator at ETSS. The Order entered by the Magistrate two days later on January 15, 1993 made clear that the investigation was not to be concluded until evidence was obtained to make it known to a scientific certainty what was underground at

---

[1] Specifically, as noted in the R&R, "the inspection particularly related to what has been characterized as an anomaly revealed by ground penetrating radar and magnetometer surveys previously conducted, as well as pipe tracing to determine the routing and discharge points of various underground piping systems relating to storage tanks, drains and the oil/water separators at the defendant's service station." R&R at p. 3.

[2] Though no objection was filed to the proposed order submitted on December 1, 1992, Warren B. Cole, on behalf of ESSOVI, circulated his own draft order on December 30, 1992.

the Esso Tutu site. Nonetheless, despite the existence of the site assessment agreement to which counsel for the Esso entities were signatories;[3] and despite the circulation of the proposed Order on the investigation of the Esso service station site, and despite the January 13, 1993 hearing, counsel for Esso, further delayed the proposed site inspection by requesting a hearing before the Magistrate to clarify the scope of the investigation to be conducted.

The Magistrate held a telephone conference on January 19, 1993, the eve of the scheduled inspection. Despite another round of

---

[3] The Stipulated Order Regarding Inspection of Real Property [the "Site Assessment Agreement"] was entered into by the parties on June 28, 1992. On July 2, 1992, Esso made a request for inspection of the Four Winds Property, which tracked the language of the Site Assessment Agreement paragraph for paragraph. On August 6, 1992, the inspection of the Four Winds Property proceeded.

In contrast, Plaintiff Four Winds' July 2, 1992 request for inspection of the Esso property, which also tracked the language of the agreement, was stalled by motions for extension of time, objections, and nonfeasance. Plaintiff Four Winds states that Esso responded to its request by first demanding an extension of time to respond beyond the five days set by the Site assessment agreement. Esso's response, in a letter dated August 7, 1992, included a censorious but meritorious objection to the site inspection dates; an insupportable objection to any "excavation" as overly intrusive; and a statement of intent to conduct its own testing sufficient to satisfy Plaintiff Four Winds' request. Two months later, in response to a letter from counsel for the Harthman plaintiffs regarding the inspection, Esso reiterated its intent to do its own testing and/or excavation necessary to "cover the scope of all aspects described in Four Winds' Request For Inspection." In a letter dated October 15, 1992, Four Winds objected to this statement of intent and asserted its right to conduct an inspection as provided for under the Federal Rules.

On November 4, 1992, four months and two days after propounding its Request for Inspection, and almost three months after it had permitted inspection of its property, Four Winds filed a motion to compel inspection. A hearing on this matter was held on November 19, 1992. Subsequent to that hearing, the Magistrate granted Esso its request to dictate the method and equipment to be used in the site assessment and the qualifications of the personnel who were to conduct the testing. However, the Magistrate's Order contained the proviso that testing was to be conducted in such a manner as to elicit the information requested by Plaintiff Four Winds.

On November 30, 1992, counsel for Esso served notice of its intent to conduct site inspection. This time the dates chosen for the site assessment conflicted with Plaintiffs' deposition schedule set by the Case Management Order. The PID/Harthman Plaintiffs reminded Esso of the conflict. Counsel for Esso allegedly refused to reschedule the site inspection. Counsel for the Harthman Plaintiffs was forced to file a motion for a protective order in which Plaintiff Four Winds joined. An emergency conference with the Magistrate was sought and granted. However, one hour before the scheduled emergency conference, counsel for Esso agreed "to set aside the inspection."

A proposed Order, incorporating Esso's objections, was submitted on December 1, 1992 by Plaintiff Four Winds, and circulated among the parties. No objection was made to that proposed Order. Esso, however, filed a proposed Order of its own on December 30, 1992. Subsequent to yet another hearing on the matter, the Magistrate entered the Order, as submitted by Plaintiff Four Winds, on January 15, 1993.

exhortations of Counsel for Esso, the Magistrate was not moved to stay the scheduled investigation of the ETSS Site. Indeed, the Magistrate reiterated several times during the January 19, 1993 teleconference, that the anomaly investigation and site assessment, including excavation and trenching if necessary, were to be conducted according to the unequivocal terms of the January 15, 1993 Order.

Notwithstanding this clear mandate as to the scope of the investigation to be conducted, counsel for Esso aborted the investigation after a show at compliance, and before any meaningful evidence could be obtained. First, Esso began the inspection hours after it was scheduled to commence. Experts brought to the site inspection by the parties at great expense were kept idle waiting for the Esso contingency to conduct the inspection. Second, Esso failed to have available the basic tools and equipment necessary to complete the exploratory phase of the inspection. Third, Esso failed to have a backhoe or other appropriate equipment on standby to commence trenching once the exploratory or non-invasive phase of the inspection had been attempted and had proved inadequate. This disregard of the Magistrate's clear mandate occurred despite the representation at the hearing on January 13, 1993, of Attorney Romero, counsel for Esso, that the equipment to carry out the investigation was on its way and would be on hand on January 20, 1993. Finally, Counsel for Esso failed to share with other parties' representatives and their experts the results of field-test it conducted.

On January 21, 1993, the pipe tracing segment of the investigation was commenced. Though what has been described as a "dark viscous material" was obtained from piping connected to the oil/water separator, samples were not taken and preserved. R&R at p. 4. The Magistrate determined in the Report and Recommendation that "on balance the pipe tracing phase of the investigation was so wholly inadequate as to be completely worthless in accurately determining the architecture of the underground piping." R&R at p. 5.

Esso's unilateral decision to abort the investigation of its Tutu site generated several motions for contempt, including Plaintiff Four Winds' Motion for an Order of Contempt, Dismissal of

ESSOVI's Counterclaim and Affirmative Defenses and Other Sanctions filed on February 5, 1993 ("Four Winds February 5, 1993 Motion for Sanctions"). Discovery again became mired in delays. Beginning on April 23, 1993, and continuing on April 26, April 28, and June 3, 1993, the Magistrate conducted fact-finding hearings on the motions for contempt and/or sanctions with respect to the January 20 & 21, 1993 investigation of the ETSS Site.

On July 16, 1993, a status conference was held before Magistrate Judge Barnard and me. It was not until November 9, 1993 that inspection of the Esso site commenced, after this Court issued a strong reprimand to current counsel to Esso that the discovery must proceed forthwith. No additional clarification from the court as to the scope of its Order was necessary.

It is obvious that former counsel for the Esso Defendants never needed additional clarification of the Magistrate's initial Order, but engaged in dilatory tactics calculated to burden and frustrate the opposition in this litigation. To excuse the flagrant abuse of the Rules of Federal Procedure to secure delay after delay in an attempt to exhaust the opponent as "zealous advocacy" is to encourage the parties in this case and parties in other cases in this jurisdiction to flout the discovery orders of the court. Failure to comply with the rules governing discovery and Orders of the court with respect to discovery often results in interminable delays, multiplying greatly the costs of litigation. This is such a case.

■ Zealous advocacy requires counsel both to act in a manner consistent with the best interests of the client, and to adhere strictly to the responsibilities and duties owed to the court and opponents. See National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 640 96 S. Ct. 2778, 49 L. Ed. 2d 747 (1976); see also EC 7-9, 7-10. Canon 7, of the Model Code of Professional Responsibility which governs the conduct of lawyers in this jurisdiction states that "A lawyer should represent a client zealously within the bounds of the law." The phrase "within the bounds of the law" places certain limitations on this representation. This phrase entails concurrent responsibilities and duties not only to the client but also to the court and our adversary system of justice, all of which are equally important.

Upon *de novo* review of the evidence adduced at the hearings on this matter before the Magistrate on April 23, April 26, April 28,

and June 3, 1993, a review of the record, and consideration of the objections and responses thereto, and for reasons noted in the Report and Recommendation, this court finds that counsels' disregard of the Order of January 15, 1993 was willful and in bad faith and cannot be excused as "zealous" advocacy.

A wide spectrum of sanctions are available to the court under Rule 37, including preclusion of evidence or dismissal of claims and counterclaims, as well as sanctions awarded against counsel, personally. However, before deciding on the appropriate sanctions for this discovery abuse, the court will now consider the later pleas for sanctions for other alleged acts of misconduct by these same parties in this litigation, past counsel for Esso and the Esso Defendants.

## II. THE SOIL TECH INCIDENT

On or about Friday, October 22, 1993, current counsel for the Esso Defendants in these consolidated actions, (i.e. Esso Standard Oil, S.A., Ltd., ["ESSOSA"], Esso Standard Oil, Co., (Puerto Rico) ["ESSORICO"], and Esso Virgin Islands, Inc., ["ESSOVI"]), informed the court that it had come to counsel's attention that "certain empirical data collected at the Esso Tutu Service Station site in December 1989, apparently had not been produced by prior counsel of the Esso Defendants." 10/28/93 Tr. at p. 14. Esso's present counsel further stated "that the existence of these materials appears to have been denied in the presence of this court and in direct response to inquiries . . ." and other discovery requests from opposing counsel. Id. A more detailed chronology of the events leading up to the setting of a hearing on this matter for October 28 and 29, 1993 was made part of the record at that time and will not be repeated.

On October 28 and 29, 1993, this court held a preliminary fact-finding proceeding regarding this appearance of attorney misconduct, discovery misconduct, breaches of the canons of ethics, and misrepresentation to and/or misleading the tribunal. The purpose of the hearings was to establish the factual predicate on the question of sanctions and whether a show cause Order should issue. The preliminary fact-finding hearing was continued on December 9 and 10, 1993 (hereinafter the "October Hearing"

and "December Hearing" respectively). As ordered by the court, the parties submitted their position briefs on or before February 3, 1994.

The term "movants" as used herein, includes the following parties: PID-Harthmans, Four Winds Plaza Partnership, Vernon Morgan, Texaco, Inc., Texaco Caribbean, Inc., Ramsay Motors, Inc., L'Henri, Inc., Paul Lazare, Andreas Gal, The Duplan Corporation, Laga Industries, Ltd., Panex Industries, Inc., Panex Company, Western Auto, Virgin Islands Housing Authority and Virgin Island Department of Education.

A. *The Evidence Presented:*

1. *Testimony of Jose Agrelot — President, Soil Tech*

On October 28 and 29, 1993, the court received testimony from a Mr. Jose Agrelot Pena [hereinafter "Agrelot"]. Agrelot is the President of Soil Tech, and was retained in December 1989 to perform soil testing at the site of Esso Tutu Service Station. The testimony pertained to objective scientific evidence obtained by Agrelot as a result of testing at the ETSS site. Agrelot testified that he received the preliminary chemical results of the testing at ETSS on December 20 & 21, 1989. See 10/29/93 Tr. at p. 47. According to Agrelot, he prepared a memorandum summarizing the preliminary results of the ETC findings and showing the location of the samples in order to discuss the results at a meeting sometime after January 23, 1990. See 10/28/93 Tr. at 43, 45-48. The handwritten copy of Agrelot's memorandum dated January 23, 1990 shows it was directed initially to Esso Standard Oil Company, then redirected to Goldman & Antonetti, Lic. Jose L. Cepeda. See 10/28/93 Tr. at 62, 63.[4] Agrelot explained that he crossed out Esso Standard Oil Company and redirected the memorandum to Goldman Antonetti, because in later reviewing his documents he realized that the work had been requested by Goldman Antonetti and not

---

[4] A copy of the handwritten memo was presented at the October 28, 1993 hearing by Four Winds as Plaintiff's Exhibit 23 and identified by Mr. Agrelot at p. 62.

Esso. See 10/28/93 Tr. at 62.[5] The memorandum identifies the project as "Esso Tutu Car Care Center, Soil Sampling, (Job No. 89579)."

Agrelot testified that he recalled discussing the results of the sampling and the contents of the memorandum with all of the attendees of the meeting, among whom were an Esso representative, Mr. Blanco, Vice President and Operations and Administrations Manager for ESSORICO (see 12/9/93 Tr. at 85, 86), and Messrs. Jose Cepeda and Francis Torres, Counsel for Esso at the time, from the firm of Goldman & Antonetti. See 10/28/93 Tr. at 42-46, 94-96, 105; 10/29/93 Tr. at 27-29. Agrelot recalled being instructed "that the work should be kept privileged and confidential . . ." (see 10/29/93 Tr. at 36), to keep "all information in his files and not to complete the final report." 10/28/93 Tr. at 49. The January 23, 1990 Memorandum which is captioned "PRIVILEGED AND CONFIDENTIAL" supports Agrelot's contention that he was so instructed. See EXHIBIT No. 12. Agrelot could not recall specifically who gave him the instruction, but he testified that he was told to do so "by the attorneys," and that Mr. Jose Blanco, Vice President of ESSORICO and member of the board of directors of ESSOVI "was present at that moment" when the lawyers told him to keep his report privileged and confidential. See 10/29/93 Tr. at 35, 36.

Agrelot further testified that he kept the memorandum indexed under the project number in his files for Goldman Antonetti. See 10/28/93 Tr. at 50. Although Esso was invoiced for and paid an additional five thousand dollars for preparation of a report, a final report was never requested. See 10/28/93 Tr. at 49, EXHIBIT No. 26. He also testified that from January 1990 to the present, neither Esso nor its counsel, Goldman Antonetti, made a specific request for these particular testing results and report. See 10/28/93 Tr. at 50-52; 10/29/93 Tr. at 24. He claimed that it was located seven or eight weeks prior to the October 1993 hearings because he had finally been asked for "all the reports we have done for Tutu." *Id.*

---

[5] Esso and former counsel for Esso, the firm of Goldman Antonetti Cordova & Axtmayer ["GAC&A"], now dispute the fact of who retained Mr. Agrelot to conduct the December 1989 testing at ETSS.

The critical facts of the January 23, 1990 memorandum are summarized below:

1. The samples summarized by Mr. Agrelot from boreholes at the ETSS site showed concentrations of benzene, toluene, ethylebenzene and xylene ("BTEX") ranging from 5 to 1,300 PPB. Outside of the holding tank, the highest concentrations were at bore holes taken at depths between 8 to 12 feet.

2. Samples taken from the holding tank at ETSS showed "very high" concentrations of BTEX ranging from 45,000 to 250,000 PPB.

3. Samples taken from the holding tank at ETSS showed a "very high" concentration of chlorinated hydrocarbons (PCE) of 477,330 PPB.

4. PCE contamination was recorded in all three soil samples, including the one obtained "very close to the water table."

5. That it was reported that the oil and grease separator at ETSS had no discharge connections.

6. That the liquid in the oil and grease trap was pumped to the holding tank in the rear of the office building and periodically emptied by pumping the liquid into the bathroom toilet.

Exhibit No. 12; 10/28/93 Tr. at 46-48.

Testimony was elicited from him that on or before January 31, 1990 he received a final report from ETC on the December 1989 sampling event. Though he had no independent recollection of a conference with Jose Cepeda of Goldman Antonetti, Agrelot admitted that there might have been a conference, as reflected by Goldman Antonetti's time and billing records on January 31, 1990. Agrelot conceded that in all probability the discussion would have been about the final report he had received from ETC within that week. See 10/28/93 Tr. at 74-76, 78, 79. He further admitted that it was not possible to determine the location of the samples listed in the large volumes of ETC data without the map that he had prepared and kept confidential. See 10/29/93 Tr. at 33, 34.

Before summarizing the remainder of Agrelot's testimony it is necessary to place it in context. Sometime after the December 1989 sampling event, Agrelot began working as a consultant for the Tutu Environmental Investigation Committee ("TEIC"). 10/28/93

Tr. at 52, 81-92. TEIC is comprised of representatives from Esso and Texaco, potential responsible parties (PRPs) for the contamination of the aquifer. By administrative order of EPA dated March 22, 1990, TEIC was charged with identifying the source or sources of the contamination to the aquifer for the EPA and DPNR. TEIC hired the firm of Geraghty & Miller to conduct the remedial investigation of the contamination to the Tutu aquifer. Agrelot's firm, Soil Tech, was brought into TEIC as a sub-contractor to Geraghty & Miller by Ms. Ana Gloria Ramos, the designated coordinator of TEIC for "everything related to environmental matters." See 12/9/93 Tr. at 39-41. Ms. Ramos was also the designated environmental coordinator for ESSORICO. 12/9/93 Tr. at 39-41.

Agrelot testified that though he became part of the team charged with identifying the source or sources of contamination to the aquifer for EPA, he never mentioned the December 1989 sampling results of ETSS to Geraghty & Miller, or the EPA or DPNR.[6] 10/28/93 Tr. 54, 61-62. He explained that he failed to mention the December 1989 sampling results in part because "it was not on his mind" and also because "the information was supposed to be privileged and confidential." See 10/28/93 Tr. at 54, 55; 10/29/93

---

[6] This claim is refuted by documents Bates stamped A08884 and A08885, dated 12/20/89 and 12/21/89 respectively, produced among approximately 10,000 documents by Geraghty & Miller, in connection with the 30(b)(6) deposition of Thomas V. Danahy. Mr. Danahy is an employee of Geraghty and Miller, and holds the position of a Senior Scientist and Project Manager. The documents, which bear the letterhead of Geraghty & Miller, reflect notations presumably made by Mr. Danahy. To the extent the court can decipher these notations, the 12/20/89 document reads in part:
Talked to EPA Monday — explained to them how we're proceeding. . . . —Call Agrelot
—if he tells us to talk to Esso, call McCay, (noon on 4th), what lab to use? Set up for 4/5th January.
coordinate with Agrelot
—Francis or Cepeda — how we're going to exchange information.
 The document dated 12/21/89, is captioned "Telephone Conversation Record," and states it was from "Dan" to "Agrelot." The notations in this document read as follows:
—We will coordinate to meet in STT 1/4, will talk next week Re: exchange of info — he put me on w/Ana Gloria Ramos - Esso
she wants me to talk to Francis Torres wants to make sure we work as a team concerned about lack of coordination w/Texaco

Tr. at 8.[7] Later Agrelot testified that when discovery was conducted at his office, these files on the December 1989 testing at ETSS may not have been discovered because they were filed "under the Goldman, Antonetti not under Tutu." See 10/28/93 Tr. at 108-110.

Agrelot also gave testimony about an internal memorandum, dated May 3, 1990, drafted by Warren Cole, Esq., of the law firm of Hunter, Coliani, Cole & Turner, local counsel to Esso.[8] The May 3rd memorandum memorialized the discussion that had taken place during a meeting with Messrs. Torres, Romero, Cepeda, Cole and Agrelot. In relevant parts, the May 3rd Memorandum to File states at the following numbered paragraphs:

3. The latest soil analysis obtained found Chlorinated Hydrocarbon (CHC) contamination in two areas within the gas station:

(a) In the vicinity of the oil/water separator, it was found that there were 300pbb(sic) of chlorinated hydrocarbon (CHC) in the top two foot layer of soil. It was noted that this soil was backfill behind the retaining wall of the western boundary of the property, and that contamination was not below this two foot layer.

(b) On the northwest corner of the property, 10pbb(sic) of the CHC was discovered at a level of eight feet below grade. Above this level no contamination was found.

8. Agrelot reviewed the history of soil and water testing relating to the Tutu aquifer showing CHC contamination in the aquifer and soils:

(a) The first indication was the EPA sampling of existing working wells, which showed CHC contamination;

---

[7] During the second day of the October 1993 hearings, Agrelot stated that he never mentioned the December 1989 testing, in part because he "didn't think the results imply anything else that was not known until that particular time . . . [since] the concentrations found were very close to the ones that EPA had sampled before." 10/29 Tr. at 8.

[8] The memorandum was produced in response to this court's October 25, 1993 order. As a result of an assertion of privilege by Esso, the memo was redacted. See Order of October 27, 1993. During the October hearings, the Court indicated its intention to rely on the memo and read parts of it into the record. See 10/29/92 Tr. at 74-77. The contents of the memo were corroborated by various witnesses. See, for instance, 10/28/93 Tr. at 65-67. It was not marked as an exhibit during the hearings and is admitted as the Court's Exhibit A. Attorney Cole declined to proffer testimony or witnesses. See 12/10/93 Tr. at 90.

\* \* \*

(e) The fifth indication was the "preliminary soil assessment" conducted by Esso showing the two sites within in (sic) the station referred to previously

10. Agrelot pointed out that even small traces of CHC contamination in the soils pose significant problems, insofar as a single cup of pure CHC can contaminate one million gallons of water (4pbb max level for potable water). He also pointed out that over 400 pbm(sic) of CHC were found in the soil at the laundry.

12. Frances Torres proposed further soil analysis around the station to gather more data in an effort to try to show that Esso did not contribute to the CHC problem with the aquifer. The question then arose as to whether Esso needs or desires such additional information at this stage. When asked, Agrelot said if we excavate around the oil/water separator and storage tank and find clean soils beneath the pits, that this would not be conclusive that contaminants did not migrate through the soils and into the aquifer. On the other hand, if we find dirty soils beneath the pits, this would be devastating information tending to show that the Esso station did significantly contribute to the pollution of the aquifer. It was determined that the risks of finding such contamination outweighed any possible benefit of finding clean soils, and it was decided that no such testing should take place at this time.

See Court Exhibit, Annex A.

Agrelot testified that he had no recollection of this meeting. However, be admitted that he must have been present because of the phrase in the May 3rd memorandum "a single cup of PCH (sic) can contaminate four million gallons of water." See 10/28/93 Tr. at 66 (Witness: I do remember this particular phrase because I have used it before so I know that probably . . . I was there.") Agrelot testified that though he may have discussed his report summarizing the ETC results, which were contained in four large volumes of data, he does not recall giving a hard copy of his summary or the ETC reports to anyone at G&A or Esso until he was reminded recently of the December 1989 work by Ana Gloria Ramos of Esso. See 10/28/93 Tr. at 52, 79-81.

On October 29, 1993, Agrelot reiterated his earlier testimony that he believed his memorandum report on the December 1989 testing was to be kept "privileged and confidential" and that was the primary reason he did not disclose the memorandum. See 10/29/93 Tr. at 34-37. Agrelot stated that though he may not have distributed the handwritten memorandum to the attendees of the January 23, 1990 meeting he:

> should have shown and maybe distributed the map to all of them in order for them to locate where the sampling points were. . . . because they had to look at the map in order to know where the samples were taken. But I know if anything was distributed at that moment [it] was probably the map.

10/29/93 Tr. at 28. Agrelot later admitted that without the map showing the location of the soil borings in the Tutu area, a person could not pick up the ETC reports alone and know the soil borings were on the ETSS property. 10/29/93 Tr. at 33, 34. Agrelot added that Mr. Jose Blanco, the Vice President of ESSORICO, was at the January 23rd meeting when he presented his report. 10/29/93 Tr. at 35, 36. Agrelot explained that he was told to keep the files on this testing in his hands. See 10/29/93 Tr. at 36. Agrelot first testified that he was instructed by counsel from Goldman Antonetti that the report was "privileged and confidential." He added the qualification that because, generally, his work for Esso was to be kept privileged and confidential, he characterized the report in preparation for the meeting as privileged and confidential. See 10/29/93 Tr. at 36-37.

2. *Testimony of Ana Gloria Ramos — Environmental Coordinator, ESSORICO*

On December 9, 1993, at the continuation of this fact-finding hearing, the court heard testimony from Ms. Ana Gloria Ramos, Chemical Engineer in Health, Safety and Welfare for the Esso Standard Caribbean Division ["Ms. Ramos"]. See 12/9/93 Tr. at 14. Ms. Ramos testified that she retained Soil Tech, Agrelot's firm, to conduct testings for ESSOVI, at the ETSS site, among others. See 12/9/93 Tr. at 14, 15. Ms. Ramos admitted that it was her signature on the document (marked as Exhibit 6, Annex A) dated December

270

13, 1989, authorizing the testing to be conducted at the ETSS site. See 12/9/93 Tr. at 15, 16. The document, signed by Ms. Ramos and described by her as a justification to the accountants for deviating from the usual bidding procedure, was translated by a certified court translator and reads as follows:

> The study has a purpose to define if in the area of the station of Danny Bayard, Tutu, St. Thomas, U.S.V.I., there is a presence of chlorinates with objective to submit our objection to the EPA, to include us under CERCLA in the administrative order of this case.
> The agency [EPA] accepts our objection if we have data to substantiate it, which results are needed with urgency before December 22nd, 1989, as agreed in meeting of November 21, 1989.

EXHIBIT 6, ANNEX A; 12/9/93 Tr. at 71, 72. Ms. Ramos, however, did not have independent recollection of giving the authorization for the soil sampling as reflected in the document. Although, Ms. Ramos admitted that a copy of the December 21, 1989 facsimile of the results of this "urgent" sampling was retrieved from her files, she did not recall receiving this facsimile on the results of the testing. See 12/9/93 Tr. at 42,43; EXH. 14. Neither did Ms. Ramos recall meeting or speaking with the lawyers at G & A to discuss the results of the soil sampling, though confronted with billing statements recording meetings on December 20 and 21, 1993 with Francis Torres. See 12/9/93 Tr. at 47, EXH. 15 (G & A January 21, 1990 billing statement showing one December 21, 1989 conference with Mr. Blanco and two December 21, 1989 conferences with Ms. Ramos, one including Agrelot) and EXH. 16 (G & A) January 21, 1990 billing statement stating that there was one December 21, 1989 conference with Mr. Jose Blanco, two conferences on that date with Agrelot, and three with Ms. Ana Gloria Ramos, one including Agrelot, as well as receipt and explanation of the soil sampling results and a conference with Mr. Nachman of Geraghty & Miller). Indeed, exhibit 16 references several conferences with Ms. Ramos, including one to discuss arrangements with Geraghty and Miller, none of which Ms. Ramos could recall. See 12/9/93 Tr. at 47-49.

Ms. Ramos was examined at great length with respect to her role in the certification of discovery responses in this case and her

certification of responses to requests for information of the EPA. According to Ms. Ramos, though her signature evidences that she was charged with the responsibility of certifying the responses on behalf of ESSO, the responses were actually prepared by outside counsel, Goldman Antonetti. See 12/9/93 Tr. at 23, 24, 31. Ms. Ramos admitted to participating in the preparation of the December 15, 1987 response to EPA and to reviewing and certifying the April 29, 1991 response. 12/9/93 Tr. at pp. 25, 30, 31. She also testified that, although she appended her signature, under oath, to various responses to discovery in this case, as well as to the EPA responses, she did not recall making any inquiry as to the truth of the answers, or the information contained therein. See 12/9/93 Tr. at 22-24, 30-35, 38.

One of Ms. Ramos' unequivocal statements was her admission that "I saw the employees of Mr. Bayard were discharging from (sic) the oil and water separator into the toilet." See 12/9/93 Tr. at 69. She admitted that she saw this done on another occasion when she visited the site. See 12/9/93 Tr. at 70. Ms. Ramos testified that on both occasions she told Daniel Bayard that the practice "was not supposed to be done." 12/9/93 Tr. at pp. 69, 70. Later Ms. Ramos testified that Bayard[9] told her he had problems with disposal of the contents of the oil/water separator and needed the assistance of Esso. See 12/9/93 Tr. at 79, 80. Aside from mentioning the problem to her supervisors, Ms. Ramos testified that she did nothing to assist Bayard with the problem of disposal. See 12/9/93 Tr. at 80.

An August 3, 1990 memorandum from Mr. Bustelo, corporate counsel for ESSORICO, ESSOVI, and Esso CCD division, to Ms. Ramos' supervisor, Mr. Jose Blanco, references a meeting where "the subject came up of the analysis of sensitive documents which was requested of Agrelot of Soil Tech, which has been pending for quite some time." See EXH. 13. Ms. Ramos, a recipient of that memorandum, could not identify which documents were referred to as "sensitive documents." 12/9/93 Tr. at 74-75. Even though there is no mention of the holding tank at ETSS in the memo, Ms. Ramos testified that the subject of the memo was "Tutu holding tank." 12/9/93 Tr. at 37, 38; Exhibit 13.

---

[9] Daniel Bayard is the operator of the Esso Tutu Service Station.

*3. Testimony of Jose Blanco — Vice President of Operations and Administration for ESSORICO; member of the Board of ESSORICO and ESSOVI:*

Jose Blanco (hereinafter "Blanco") testified that he had been working for Esso until April of 1987 and resumed working for Esso on January 1, 1989. Blanco stated that he was rehired as an "outside title oil specialist" for ESSORICO, and that as Vice President of Operations and Administration, he was "entrusted with the function of environmental matters." 12/9/93 Tr. at 85-87. Blanco was also named to the Board of Directors of ESSORICO and ESSOVI. See 12/9/93 Tr. at 86. He denied seeing the Agrelot January 23, 1990 memorandum before October 1993. Id. Blanco was not positive he was even at the January 23, 1990 meeting. See 12/9/93 Tr. at 111. However, he admitted to having been briefed, at least verbally, about the information in the report, sometime around late December 1989. 12/9/93 Tr. at 86.

Blanco stated he discussed the results of the December testing at ETSS with his immediate supervisor, Mr. C. Stuart Griffith, President of ESSORICO and of ESSOVI and member of the board of directors of both corporations. See 12/9/93 Tr. at 88. The information was also conveyed to Mr. J. S. Simon, Mr. Griffith's immediate supervisor, who came to Puerto Rico early in 1990. 12/9/93 Tr. at 89, 90. Blanco testified that for the meeting with Mr. Simon, a presentation, including charts, was prepared in order to bring Mr. Simon abreast. Id. Mr. Simon, apparently, did not have time to receive Blanco's presentation, but was given the report. See 12/9/93 Tr. at 89, 92. Blanco testified that he gave the information to Mr. Otto Bustelo, with instructions that it "contained confidential data, please handle as attorney/client privilege." 12/9/93 Tr. at 90. The "report" prepared by Blanco was not extant at the time of this hearing. Id. Though he had believed these events occurred in January, Blanco stated he must date these events as occurring around February 22, 1990, from documents placing Mr. Simon in Puerto Rico at that time. Id. Blanco remembered discussing the results of the December testing with "Lodo. Francis Torres, Mr. Cepeda." Id. With respect to the August 3, 1990 memorandum directed to him from Mr. Bustelo, Blanco could not recall what documents were referred to as "sensitive documents." 12/9/93 Tr. at 99, 100.

273

According to Blanco, he was not responsible for and had no role in preparing responses for the EPA. 12/9/93 Tr. at. 93, 94. As a result, he had no knowledge of whether the results of the December testing were revealed to the EPA. *Id.* Blanco admitted that during his deposition testimony in April 1991, he denied knowledge of the presence of chlorinated solvents at ETSS or of any "problem related to chlorinated solvents" there. 12/9/93 Tr. at 95. Blanco stated he reviewed the April 29th, 1991 letter from Geraghty & Miller to the EPA alleging that "there is no evidence that Esso Tutu Service Station has released or contributed chlorinated compounds to the Environment and thus the citations are unwarranted." 12/9/93 Tr. at pp. 96, 102. Blanco testified that he relied "totally on the advise of counsel [on how to] respond and prepare [responses to the EPA]." 12/9/93 Tr. at pp. 102, 103. Blanco testified that he did not believe it necessary to present Agrelot's December 1989 findings to the EPA because the EPA already knew (from its own testing) that PCE had been found at the site. 12/9/93 Tr. at 103. He emphatically denied any attempt to hide information, claiming that his technical people had convinced him that "this study was very positive." 12/9/93 Tr. at 105. According to Blanco, ESSO interpreted the results as not showing "definite information . . . that can condemn ESSO as the source and the contaminator of the aquifer." 12/9/93 Tr. at 103-105, 119.

Blanco admitted that he knew the Agrelot December 1989 testing cost his company in excess of $60,000, but denied knowing that Agrelot was told not to prepare a final report, and that a final report was, indeed, never prepared. 12/9/93 Tr. at 97, 98, 106. According to Blanco, a final report was not "critical" because all he needed to know were the "main concepts of . . . these results". 12/9/93 Tr. at 106, 107. Blanco stated that though he was "delighted" with the results of the December 1989 testing, he did not disclose the findings to the EPA because "this information was not new to the EPA." 12/9/93 Tr. at 107.

Moreover, Blanco testified that he learned later that the raw data of the December testing, the ETC reports, was disclosed to the parties in 1990. See 12/9/93 Tr. at 94. After testifying that the ETC volumes provided sufficient data to locate the samples listed therein, Blanco participated in an in-court demonstration, wherein

274

he was provided with all four volumes of the ETC raw data, and given ten minutes to determine the location of a sample. See 12/9/93 Tr. at 138-141. In response to the question: "Sir, having looked through those, and you pointed out the sample number, were you able to find anything within those documents which disclosed where that sample came from?" Blanco admitted that without

> [t]he location you can't. There is a code in there that definitely you would have to have the code in order to determine the location.

> If you can determine the code, concentration, depth at which the concentration was found, the process involved in the analysis. You can basically get all the information you want except you would have to have the code.

> The Court: You can't use it without a map.
> Mr. Blanco: You have to have a code, yes.

12/9/93 Tr. at 140, 141.

Like Agrelot, Blanco testified that because no formal report was issued, the results were never disclosed to the EPA. See 12/9/93 Tr. at 127. Blanco admitted that during this period he was Chairman of TEIC (Tutu Environmental Investigation Committee). See 12/9/93 Tr. at 124. He, however, saw the position as imbuing him with no "additional powers, no additional responsibility." Id. It was "simply a matter of building up a structure so we can answer the EPA requirements as a group." Id. Moreover, Blanco explained, in the first instance the December testing was not "foremost" in his mind, and in the second, it was subject to the attorney/client privilege. See 12/9/93 Tr. at pp. 128, 129.

Finally, with regard to the liquid from the ETSS oil/water separator that was pumped into the toilet, Blanco admitted that the water is always contaminated with some amount of oil. See 12/9/93 Tr. at 135. He further admitted that in a situation where the separator was devoid of water, only oil would be present. See 12/9/93 Tr. at 136, 138.

4. *Testimony of Eugenio Romero, Esq. — Former Counsel for the Esso Defendants*

Eugenio Romero (hereinafter "Romero"), the attorney with the law firm of Goldman Antonetti in charge of the litigation aspect of the Tutu case for ESSO, appeared in the Virgin Islands litigation in late 1989. See 12/9/93 Tr. at 145. Romero denied having seen the Agrelot handwritten memo prior to October 1993. See 12/9/93 Tr. at 147. The gist of his direct testimony was that if the other parties had thoroughly examined the volumes of the ETC reports produced by his firm on behalf of the Esso defendants, their experts would have been able to determine that PCE's and other chlorinated compounds were indicated in the samplings. See 12/9/93 Tr. 148-52. Romero admitted that the parties would need a map to locate the boring sites, and that it should have been produced. 12/9/93 Tr. at 152, 153. He also admitted that the ETC reports were produced in response to a request for information relating to the entire Tutu Area and that no mention of the ETSS was made in the response. See 12/9/93 Tr. at 176. He alleged that he would have had no problem producing the map, if anyone had asked. See 12/9/93 Tr. at 154.

Romero also admitted that the December Soil Tech reports produced in Esso's responses were misnumbered January 11, 1989, instead of 1990, and that several reports similar to the January 23, 1990 Soil Tech report were produced. See 12/9/93 Tr. at 153. According to Romero, the Soil Tech map and report was not produced initially because it was improperly identified in the data base and overlooked. See 12/9/93 Tr. at pp. 155, 156. He testified that there was never a "conscious decision" not to produce the testing results. 12/9/93 Tr. at 155. With respect to later requests for the reports, the misidentification was alleged to have caused the continuing failure to produce. See 12/9/93 Tr. at 155, 156. In sum, Romero explained the non-production of the documents as sheer inadvertence.

Finally, Romero testified that he personally, or someone from his office, reviewed with Ms. Ramos the discovery responses of the Esso Defendants in this litigation, prior to her signing them. See 12/9/93 Tr. at 178, 179, 183. "I make sure that if Ana Gloria Ramos

is signing whatever responses are being advanced, that she is totally satisfied with the contents of those responses." *Id.*

5. *Testimony of Francis Torres, Esq. — Former Counsel for the Esso Defendants*

Francis Torres (hereinafter "Torres") is a partner in Goldman Antonetti, who testified that he has practiced environmental law in Puerto Rico since 1977. See 12/10/93 Tr. at 5, 6. Torres testified that he was introduced to Agrelot as an Esso consultant and that he had no knowledge of the terms of Agrelot's employment until he was shown an invoice at the December hearing. See 12/10/93 Tr. at 10, 47.

Torres admitted receiving on December 21, 1989 a facsimile copy of a table showing some results of Agrelot's sampling at ETSS. See 12/10/93 Tr. at 11; EXHIBIT 14. He also admitted simultaneously receiving a copy of the map showing the location of the sampling points. Id. He testified that he discussed the documents with Mr. Jose Cepeda, Ana Gloria Ramos, Agrelot, Blanco and Romero prior to the January 23, 1990 meeting. See 12/10/93 Tr. at 11, 12. He identified the "Privileged and Confidential" agenda for the January 23 meeting as being prepared by him and confirmed that the meeting was attended by Blanco, Ana Gloria Ramos, Agrelot, himself, and Mr. Bustelo, Esso corporate counsel. See 12/10/93 Tr. at 13, 14; Exhibit 27. He alleged that the results of Agrelot's December '89 testing at ETSS were discussed only briefly because "[i]t was a side issue. We didn't spend too much time. We already knew the results." 12/10/93 Tr. at 15. According to Torres, he did not see Agrelot's memo dated January 23, 1990 until it was sent to him in Barcelona by facsimile on October 26, 1993. See 12/10/93 Tr. at 16. He corroborated Romero's testimony that the sampling results and map had not been produced in litigation because they were misfiled. See 12/10/93 Tr. at 20-23.

Significantly, Torres testified that another Esso consultant, Carlos Belgodere, allegedly required his assistance to prepare proper reports for submission to EPA. See 12/10/93 Tr. at 29-32. As a result of Mr. Belgodere's alleged lack of qualifications, his services were terminated and he was replaced by Agrelot. Id. Torres admitted that he was the "principal drafter" of the April 29, 1991

letter to the EPA and that despite his knowledge of the Agrelot test results, those results were not reflected in the letter. 12/10/93 Tr. at 42-44; Exhibit 10. He acknowledged that at the time he received the data showing CHC's in the ETSS holding tank and soil, he was working toward dissuading EPA from looking at ETSS as a source of the CHC's. See 12/10/93 Tr. at 52-54.

*6. Testimony of Jose A Cepeda, Esq. — Head of the Environmental Department of Goldman Antonetti*

Jose A. Cepeda (hereinafter "Cepeda") testified on December 10, 1993 that he was a partner in Goldman Antonetti from the time he joined the firm in 1986. See 12/10/93 Tr. at 56, 57. He admitted that G&A had received by facsimile the December 21, 1989 sampling results and map and that he had discussed the results with Torres. See 12/10/93 Tr. at 57, 58; Exhibit 14. He confirmed that Mr. Jose Blanco, Ms. Ana Gloria Ramos, Agrelot, Mr. Otto Bustelo and Mr. Francis Torres had attended the January 23, 1990 meeting. See 12/10/93 Tr. at 59. Like Torres, Cepeda testified that he had not seen the January 23, 1990 report of Agrelot until it was sent by facsimile to him overseas on October 26, 1993. *Id.* He argued that because his name was misspelled, and he had not corrected it, he was certain he never saw the report. See 12/10/93 Tr. at 60, 62, 63. He suggested that his name was on the report because he was the head of the environmental department of G&A. See 12/10/93 Tr. at 71.

Cepeda testified that he had prior knowledge that there were PCE'S in the holding tank at ETSS but that the specific amount found in the Agrelot sample was never discussed with him. See 12/10/93 Tr. at 65, 66. He further testified that he had no knowledge of instructions to Agrelot to retain documents in his files or refrain from producing a final report. See 12/10/93 Tr. at 66. Finally, he testified that he had been introduced to Agrelot in the Esso offices and that it was his "impression" that Esso had hired Agrelot to conduct the December sampling. 12/10/93 Tr. at 70.

*7. Testimony of Otto M. Bustelo, Esq. — In-house Counsel for ESSORICO, ESSOVI, and the Esso CCD Division*

On December 10, 1993, Mr. Otto Miguel Bustelo-Darriga testified that he was legal counsel, in house, for ESSORICO, ESSOVI, and

278

CCD. 12/10/93 Tr. at 81, 82. He admitted being present at the January 23, 1990 meeting and that he "could have heard something . . ." about Agrelot's sampling at that meeting. 12/10/93 Tr. at 83. He had no recollection of Agrelot being instructed to treat his work as privileged. 12/10/93 Tr. at 86.

### III. THE LAW

A. *Standards for Imposition of Sanctions*

1. *Sources of Authority*

 This court bears the responsibility and has authority to monitor the conduct of attorneys and litigants appearing before it. With this court's authority comes the inherent power to impose sanctions against members of its Bar and to levy monetary sanctions against party litigants, both to "vindicate its judicial authority and to make the prevailing party whole for expenses caused by an opponent's obstinacy" or misconduct. See Chambers v. Nasco, 501 U.S. 32, 111 S. Ct. 2123, 2133, 115 L. Ed. 2d 27 (1991); See also Roadway Express, Inc. v. Piper, 447 U.S. 752, 765, 100 S. Ct. 2455, 2463, 65 L. Ed. 2d 488 (1980). This authority is reinforced, but not limited, by statutes and rules. In the instant matter, the court's power to impose sanctions is also invoked pursuant to Rules 11, 26(g) and 37 of the Federal Rules of Civil Procedure, and 28 U.S.C. § 1927. In Chambers v. Nasco, the Supreme Court noted that a court's inherent power is "both broader and narrower than other means of imposing sanctions, . . . and extends to a full range of litigation abuses." Chambers v. Nasco, 111 S. Ct. at 2134. However, the Supreme Court sounded the following note of caution that "because of their very potency inherent powers must be exercised with restraint and discretion." Chambers v. Nasco, 111 S. Ct. at 2132. As such, courts are directed to examine whether the conduct at issue "could be adequately sanctioned under the rules" and statutes before "resorting to the inherent power." Chambers v. Nasco, 111 S. Ct. at 2136. Imposition of sanctions under the court's inherent powers requires a finding of "bad-faith conduct during the course of litigation." *Id.*

 Movants also argue that the court is authorized under both Rule 11 and Rule 26(g) of the Federal Rules of Civil Procedure to

impose "an appropriate sanction upon an attorney, a party, or both" for "presenting to the court (whether by signing, filing, submitting, or later advocating," a false or misleading statement. Because, as amended in 1983, Rule 11 tests the certification of "knowledge and reasonable inquiry" of pleadings filed with the court, no finding of subjective bad-faith is required before sanctions may be imposed for violations of its provisions. Rather, a Rule 11 violation is judged by an objective standard of reasonable inquiry. Chambers v. Nasco, 111 S. Ct. at 2134, citing Business Guides, Inc. v. Chromatic Communications Enterprises, Inc., 498 U.S. 533, , 111 S. Ct. 922, 932, 112 L. Ed. 2d 1140 (1991). Likewise, under Rule 26(g) the standard for determining the appropriateness of sanctions is "reasonable inquiry."

 ■■ Federal Rule of Civil Procedure 37 gives the court broad authority to impose any of a wide range of sanctions for discovery abuses against both counsel and party. Rule 37(a)(4) authorizes only the mildest or monetary sanctions for the failure to provide or permit discovery or for obstructing the discovery process. However, where the discovery violation involves a failure to obey a court order compelling discovery, under Rule 37(b) the court, "may, within reason, use as many and as varied sanctions as are necessary to hold the scales of justice," including the most severe sanction of dismissal. Failure to disclose, or the making of false or misleading disclosure during discovery amounts to the type of "culpable failure" that is appropriately disciplined pursuant to Rule 37(b).[10] The fashioning of the appropriate sanction is committed to the sound discretion of the district court judge. Under Rule 37, a negligent "refusal" or "failure to comply" with discovery is a sufficient basis for sanctions. Thus, unlike sanctions imposed pursuant to the court's inherent powers, "willfulness is relevant only to the selection of sanctions, if any, to be imposed," Societe Internationale v. Rogers, 357 U.S. 197, 212, 78 S. Ct. 1087,

---

[10] Movants argue that, in addition to the Magistrate's January 15, 1993 Order, compelling discovery at the ETSS, "the valid orders violated by [Respondents] include the September 26, 1990, Case Management Order, the February 5, 1992 Second Amended Case Management Order, [and] the November 9, 1992 Third Amended Case Management Order." Movants argue that the failure to correct the misleading discovery responses is sanctionable pursuant to Rule 37(b), as authorized by Rule Fed. R. Civ. P. 16(f).

1095, 2 L. Ed. 2d 1255 (1958); see also Argo Marine Systems, Inc. v. Camar Corp., 102 F.R.D. 280, 285 (S.D.N.Y. 1984) (citing Id.) (observing that "gross or even simple negligence on the part of a noncomplying party or its attorney can be sufficient basis for imposition of the less severe sanctions provided under Rule 37."). However, once culpable conduct is found, the court is required to impose such sanctions that are just, both "to penalize" the wrongful conduct and "to deter those who might be tempted to such conduct in the absence of a deterrent." National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 643, 96 S. Ct. 2778, 2781, 49 L. Ed. 2d 747 (1976).

█ In addition, Movants invoke the court's power to sanction pursuant to 28 U.S.C. § 1927 which authorizes the assessment of fees against attorneys who so multiply the proceedings in any case unreasonably and vexatiously. Under Section 1927, the assessment of fees is to be satisfied personally by the attorney.

### B. *Criminal or Civil Contempt*

The court turns now to the issue of whether the sanctions to be imposed are for criminal or civil contempt. Respondents, the Law Firm, and the individual attorneys subject to this court's jurisdiction, posture the proceeding as one for criminal contempt. Citing the Third Circuit Court of Appeals in Taberer v. Armstrong World Industries, Inc., 954 F.2d 888, 909 (3d Cir. 1982), these Respondents contend that before criminal sanctions may be imposed, this court must find that they acted with "knowledge that [their actions were] wrongful and [with] a purpose nevertheless to do the act[s]." In addition, Respondents posit that evidence of "[g]ood faith pursuit of a plausible though mistaken alternative is antithetical to contumacious intent, however unimportant it may be in the context of civil contempt." Taberer 954 F.2d at 909, citing In Re Brown, 147 U.S. App. D.C. 156, 454 F.2d 999 (D.C. 1971). See Memorandum of Eugenio Romero at p. 16, and Goldman Antonetti Cordova & Axtmayer Post Hearing Memorandum at p. 33 (arguing that criminal contempt is extremely harmful to the professional reputations of the Law Firm and attorneys, and suggesting civil sanctions as more appropriate).

Respondents reliance on Taberer is selective. The court in Taberer, after a thorough analysis of the nature of civil and criminal contempt proceedings concluded, that:

> the key distinction between civil and criminal contempt lies in the court's purpose. Civil contempt sanctions are intended to coerce or compensate; criminal contempt sanctions to punish. (citation omitted). 'Criminal contempt, more specifically, is reserved for those instances where the court must vindicate its authority.'

954 F.2d at 896. The issue was addressed definitively by the Supreme Court in Hicks On Behalf of Feiock v. Feiock, 485 U.S. 624, 628-39, 108 S. Ct. 1423, 1428-33, 99 L. Ed. 2d 721 (1988). There the Supreme Court noted that:

> The question of how a court determines whether to classify the relief imposed in given proceeding as civil or criminal in nature, for purposes of applying the Due Process Clause and other provisions of the Constitution, is one of long standing, and its principles have been settled in their broad outlines for many decades.
>
> * * *
>
> The critical features are the substance of the proceeding and the character of the relief that the proceeding will afford. 'If it is for civil contempt, the punishment is remedial, and for the benefit of the complainant. But, if it is for criminal contempt, the sentence is punitive, to vindicate the authority of the court.' Gompers v. Bucks Stove & Range, 221 U.S. 418, 441, 31 S. Ct. 492, 498, 55 L. Ed. 797 (1911).

Thus, whether the proceeding is one for civil or criminal contempt depends on the form of relief to be granted. Further, as the Court in Hicks noted "[i]n contempt cases, both civil and criminal relief have aspects that can be seen as either remedial or punitive or both." Hicks, 485 U.S. at , 108 S. Ct. at 1431. As that Court explained, where the penalty is conditional, and even if it calls imprisonment, the proceeding is civil "if' the defendant stands committed unless and until he performs the affirmative act required by the court's order.'" Hicks, 485 U.S. at 632, 108 S. Ct. at

282

1429 (quoting Gompers, 221 U.S. at 442, 31 S. Ct. at 498. For this reason, it is said that the imprisoned civil contemnor "'carries the keys of his prison in his own pocket.'" Indeed, Taberer, to which Respondents cite, notes that "'in responding to a single contemptuous act, a court may well impose both civil and criminal sanctions—wishing to vindicate its authority and to compel compliance.'" 954 F.2d at 896, (quoting In Re Irving, 600 F.2d 1027, 1031 (2d Cir. 1979). Accordingly, if the evidence before the court is sufficient to support the conclusion that the prerequisites to the imposition of criminal sanctions are met in this matter, then this court may consider the imposition of criminal sanctions to punish the disobedient conduct. However, as urged by our court of appeals, this court will "consider [first] the imposition of civil contempt sanctions before resorting to criminal contempt." Taberer, 954 F.2d at 896, quoting Waste Conversion, 893 F.2d 605, 612 (3d Cir. 1990) (*en banc*).

## IV. FINDINGS OF FACT

The parties have taken antipodal positions on the issue of sanctions. Movants seek the imposition of a variety of sanctions ranging from the least severe in the spectrum or the "mildest,"[11] monetary sanctions, to the most extreme, dismissal of claims and counterclaims. Respondents argue that there is no or slight prejudice and therefore sanctions are not warranted. Moreover, Respondents argue that, technically, they have violated no order of this court compelling discovery. Before the court can resolve this dispute it must first make findings on the issues of willfulness and bad-faith.

Upon review of all the testimony and the evidence before it, the court makes the following findings as to the disputed facts:

1. *Whether ESSO or Goldman Antonetti Retained Agrelot to Conduct the December 1989 testing?*

■ The court finds by clear and convincing evidence that Agrelot was retained by Esso. Agrelot testified at one point that he

---

[11] See Cine Forty-Second St. Theatre v. Allied Artists, 602 F.2d 1062, 1066 (2d Cir. 1979) (remarking that the "mildest [of sanctions] is an order to reimburse the opposing party for expenses caused by failure to cooperate)."

was retained by the Goldman Antonetti Cordova and Axtmayer law firm to conduct this lone testing event, having discussed the project with Mr. Francis Torres and Mr. Jose Cepeda. See 10/28/93 Tr. at 32. However, Agrelot's later testimony [10/28/93 Tr. at 37] and records produced for the hearing indicate that he was retained and paid directly by Esso. The record shows that on December 5, 1989, Agrelot sent Mr. Carlos Fuentes of Esso a four-page proposal for a soil investigation and waste oil sampling to be conducted near the oil/water separator and the holding tank at the ETSS site. The total cost for the work to be performed was $60,285.00, and the cost breakdown included a separate $5,000 estimate for "report preparation." Moreover, Agrelot's cover letter to the proposal stated that "the scope of the work have (sic) been discussed with Esso Environmental Engineer, Ms. Ana Gloria Ramos and legal counselors." See EXH. 7, 12/9/93 Tr. at 17.

Mr. Fuentes requested approval of Agrelot's proposal on an emergency basis to meet a deadline for submitting objections to the EPA. The proposal was approved by two of Esso's employees, A. Munoz and Ana Gloria Ramos. Agrelot performed the field-testing over several days, ending on December 8, 1989. The soil samples taken from eight bore holes on the ETSS site were sent to Environmental Testing and Certification Corp. ("ETC"). ETC was paid to expedite its results and returned its first preliminary analysis report on or about December 21, 1989. Moreover, on February 4, 1990, Agrelot's firm, Soil Tech, issued invoice No. E-90021, to Esso for remittance of the entire project cost of $60,285.00. This amount was approved for payment by Esso employee, Carlos Fuentes. Whatever occurred later, there can be no dispute that the client, ESSO, retained Agrelot to perform the testing.

### 2. *Whether the Non-Production of Agrelot's File was Inadvertent?*

Counsel from Goldman Antonetti argue that the non-production of Agrelot's file was due to "inadvertence" on Agrelot's part, because as Agrelot explained, he filed the information under "Goldman Antonetti" and not under "Esso". The client, ESSO, argues that there is no evidence that any of its "personnel willfully withheld anything." Esso's Memorandum at p. 14. Both of the

alleged malfeasants argue that because there was no willful withholding of the discovery materials, there can be no finding of bad-faith and intentional misconduct so as to warrant the imposition of sanctions.

 The court disagrees with both parties' positions. First, with respect to counsel from Goldman Antonetti, the court finds the claim of "inadvertence" totally contradicted by the evidence. The parties' conduct following the preliminary results of the December 1989 testing show that they viewed the results as an "evidentiary hot-potato." The court agrees, that arguably, the results were "inconclusive" as to whether the ESSO site was a source of the contamination to the aquifer. However, an inescapable conclusion is that the results were sufficiently damning to ESSO, in that they would have provided the Plaintiffs, the EPA and cross-claimants with sufficient ammunition to make the ESSO site a focal point in the investigation for source or sources of the contamination. See EXH. 12, Agrelot's January 23, 1990 Memorandum, and Cole Memorandum, Court Exh. A.

. The parties engaged in several conferences and discussions, as evidenced by the records produced by G & A and the aforementioned file memoranda as to the best strategy to take with respect to these results.[12] Clearly, the report would not have served the

---

[12] On December 20, 1989 the first reports regarding the testing/sampling were sent by facsimile from the lab in New Jersey to Mr. Agrelot.

On December 21, 1989, Attorney Frances Torres logged three (3) conversations with Mr. Agrelot, and three conferences/conversations with Ana Gloria Ramos of Essosa. The third conference with Ms. Ramos included Mr. Agrelot.

On January 2, 1990, attorney Torres recorded a telephone conference with Ana Gloria Ramos, followed by "intra-office meetings regarding St. Thomas inspection and sampling strategy . . ."; a conference with the consultant for the Exxon Corporation Mr. Frank Delucca, regarding selection of monitoring well locations, as well as four (4) more conferences with Mr. Agrelot. See Four Winds Response at p. 7.

On January 3, 1990, the Goldman Antonetti records reflect several conferences/ meetings took place with Attorney Cepeda, Ana Gloria Ramos and Agrelot, and with Attorney Torres, Ana Gloria Ramos and Mr. Agrelot regarding "litigation considerations in investigatorial program with EPA, occupying seven and a half (7 ½) hours of Attorney Torres day."

On January 23, 1990, the same day that Mr. Agrelot testified he met with Francis Torres, Jose Cepeda and Jose Blanco of Essosa and discussed the "draft memorandum," Attorney Torres recorded on his time sheet that he met at the Esso offices with Mr. Blanco, Mr. Bustelo (corporate counsel of ESSOSA) and A.G. Ramos. Attorney Torres recorded conferring with Mr. Agrelot and the "receipt and examination of ETC summary package. Supporting documents and technical reports."

purpose for which it was commissioned, that is, to support "[ESSO's] objection to the EPA (Environmental Protection Agency) to include us under CERCLA in the administrative order of this case." Exh. 6, Annex A. Attorney Cole's memorandum of May 3, 1990, at numbered P 12, eloquently states this conclusion:

Francis Torres proposed further soil analysis around the station to gather more data in an effort to try to show that Esso did not contribute to the CC problem with the aquifer. The question then arose as to whether Esso needs or desires such additional information at this stage. When asked, Mr. Agrelot said if we excavate around the oil/water separator and storage tank and find clean soils beneath the pits, that this would not be conclusive that contaminants did not migrate through the soils and into the aquifer. On the other hand if we find dirty soils beneath the pits, this would be devastating information tending to show that the Esso station did significantly contribute to the pollution of the aquifer. It was determined that the risks of finding such contamination outweighed any possible benefit of finding clean soils, and it was decided that no such testings should take place at this time.

 Subsequently, the parties continued their "wait and see" strategy that they had adopted initially, when Agrelot was told not to be concerned about producing a final report on this $60,000 plus project. It is clear that these parties wanted the Agrelot file "buried" or on the "back-burner," while they explored ways of minimizing its import. Indeed, the claim that the "file" became "lost" in their minds, strains credulity and cannot be excused as mere "inadvertence." For instance:

a. It was not "inadvertence" when on April 20, 1990, Esso filed its responses and objections to Plaintiff's Four Winds First Request for Production of Documents in the Total Vision v. Texaco, Inc. Litigation, wherein it omitted any mention of the December 1989 testing event and the January 23, 1990 preliminary report summarizing this sampling event and the results. Though the four volumes of the ETC report on the December 1989 testing event were produced, they were (a) not

identified by date or subject matter, and (b) identified as responsive to studies in the "Tutu Area" and not at the ESSO Tutu Service Station. Moreover, without Agrelot's report and the Map, both ESSO's personnel and former counsel admit, there was no way of identifying the location of the testing results as the ETSS.

b. Even if the court were to credit this claim of "inadvertence", less than two weeks later, on May 3, 1990, the subject of the December 1989 testing was discussed among Esso representatives and its counsel, and this "oversight" was not corrected. Indeed, the conclusion to be drawn from P12 of the May 3, 1990 memorandum is that this testing event was to be "ignored" or forgotten.

3. *Whether The Parties Were Prejudiced by the Non-Disclosure?*

Counsel for the firm of Goldman Antonetti argue that:

1. There is no evidence that anyone from the firm of GAC&A had requested that Agrelot "destroy, conceal, refrain from producing" or otherwise give special treatment to the information or related materials.
2. That the information had been provided in response to other discovery demands, in the form of raw data, or by reference to materials produced.
3. That Agrelot's handwritten report merely summarized the raw data, and such materials prepared by an attorney, a party or agent in anticipation of litigation is protected under Fed. R. Civ. P. 26(b)(3), or not subject to discovery under Rule 26 (b)(4).
4. That plaintiffs were not adversely affected by the failure to produce the memorandum of January 23, 1990 or the accompanying map.

The Client argues:

1. That Esso relied completely on outside counsel in developing and providing discovery responses.
2. That the scientific evidence withheld is currently insignificant, given later developed data.
3. That the parties have suffered no real prejudice.

■ Arguably, the evidence is inconclusive to support a finding that counsel or the client expressly directed Agrelot to destroy or conceal the file. However, it can certainly be argued that the Respondents "fathered" this consequence and thus must have intended it. Several factual findings that support this conclusion may be made: (1) Agrelot was told at some point that the file was "privileged and confidential";[13] (2) during or shortly after the January 23, 1990 meeting Agrelot was instructed not to prepare a final report; (3) around, the same time Agrelot was instructed to keep the file under his control; (4) Both Esso and then counsel for Esso knew of the testing event and the arguably "inconclusive" though potentially damaging results of that testing event; (5) by directing Agrelot not to produce a report or a summary, and to keep his preliminary report in his files, respondents contrived a situation where they could not produce a summary or report with the raw data because none existed; and (6) sometime after August 1990, all of the respondents suffered a "collective loss of memory" with respect to this testing event and the documents in the Agrelot files.

■ Concededly, it may have been usual to characterize the report as "privileged and confidential." However, though not especially extraordinary, it was not established that it was a common practice to treat a project commissioned and paid for by the client, as one commissioned by the law firm and to file it under the firm's name. Neither was it established, by a preponderance of the evidence that it was a usual business practice to pay in excess of $60,000 for an "emergency" project, an amount which includes a separate and distinct charge of $5,000 for the preparation of a report, and then completely and conveniently forget about the project. The court does not agree with the contention that the "file" was not handled in an "unusual" or "special" manner. It is evident that all parties involved contrived to buy time to deal with this evidence, hence the instruction to Agrelot, after the numerous

---

[13] It is immaterial to this determination, who, client or then counsel, directed Agrelot to hold the files as "privilege and confidential." The fact is that both, client and then counsel had knowledge, constructive and actual, of the testing event and of summaries and/or reports, that would follow in the normal course of events.

discussions on the results, to in effect "sit" on the file and not prepare a final report. After a while, neither the representatives from Esso or its then Counsel gave Agrelot any new instructions as to this file. Conveniently, it allegedly escaped their collective memories. It is clear from subsequent responses by respondents in this case, the cumulative effect of the instructions to Agrelot and their non-action was the "in fact" concealment of the file. This result could have been avoided had respondents acted differently. The court concludes that the evidence supports the inference of a tacit agreement on the part of all parties involved to "conceal" or "lose" or "obscure" the December 1989 testing event and the documents in the Agrelot file.

Having disposed of the question of intent, the court now addresses the question of prejudice, if any, suffered by the plaintiffs. Respondents from the law firm contend that the movants suffered no prejudice because (1) the information was disclosed as raw data; and (2) even if the parties can identify prejudice, it was due entirely to the movants own lack of diligence. The client contends that its personnel relied wholly on counsel and that movants suffered no prejudice because the information is currently insignificant in light of later developments.

█ As to the first contention, the evidence supports a finding that the submission of the four volumes of raw data, without identification as to date of the sampling event and as to the location of testing, was "a failure to answer" within the meaning of Fed. R. Civ. P. 37 (a)(3). Under the applicable legal standards, the submission of this raw data was evasive, and thus non-responsive. When Esso and then Counsel for Esso responded to the Total Vision First Request for Production of Documents on April 20, 1990, the December 1989 testing, the January 23, 1990 conference to discuss this testing and the February 1990 conference with Mr. Simon, were not too remote in time for a total failure of recall of these events on the part of these parties. Moreover, Cole's memorandum of May 3, 1990 totally refutes the claim that these "events" were not "foremost" in the minds of respondents. Nonetheless, though the parties discussed the matter in depth at that time, no one acted to

289

correct or supplement Esso's discovery response to the Total Vision Interrogatory.[14]

 Rule 33(c) places an affirmative duty on the party responding to an interrogatory to "specify the records from which the answer may be derived and ascertained . . .." Indeed, Rule 33(c) goes on to provide that "the specification shall be in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained." As was demonstrated at the hearing on this matter, neither Agrelot, Ms. Ramos nor Blanco could identify the location of the December testing event without the map [and summary] that were concealed in Agrelot's files. As the Advisory Committee Note to the 1980 Amendment to this section makes clear, a responding party's responsibility to provide answers to interrogatories is not satisfied under Rule 33(c) by dumping several volumes of unspecified raw data on opposing counsel.[15]

 Respondents further contention that any prejudice to the parties was due entirely to their own lack of diligence adds insult to injury. Moreover, the concealment of this December 1989 testing event casts an even darker light on Esso's and then counsel's conduct with respect to the Site Assessment Agreement of June 28,

---

[14] Esso's and then counsel failed to correct this "mistake" in their future responses to interrogatories:

> Four Winds Request For Production: Requests Nos. 1, 3, 9 and 11, would encompass the draft report, the lab data, or some indication that samples were taken at the Esso Tutu Service Station.
> Esso Response Dated March 17, 1992, and signed by Attorneys Romero and Cole did not raise an objection based upon privilege work product, and simply stated:
> "All documents which could be responsive to this request, related to Esso Facilities in the Tutu area, have been provided as part of Esso's previous response."
> *Ramsey's First Set of Interrogatories and Requests to Produce:*
> Interrogatories. Nos. 1, 2 and 4 asked for a description of all activities, investigations and samplings by Esso from 1987 and clearly encompassed the non-disclosed scientific material.
> Esso's Response dated 9-25-92, signed by Romero, Cole and Ana Gloria Ramos, failed to reveal the December 1989, Site Assessment by Soil Tech.
> *L'Henri's First Set of Interrogatories:*
> Sought similar information under a more general request.
> Esso Response was again misleading.

[15] The Advisory Committee note to the 1980 Amendment of Rule 33(c), states clearly, that
> If the information sought exists in the form of compilations, abstracts or summaries then available to the responding party, those should be made available to the interrogating party.

1992. As discussed in Part I of this Opinion, the opposing parties in this case attempted for more than a year to gain the type of information contained in the Agrelot files through a site assessment of the Esso Tutu Service Station. Despite the June 1992 Order of Stipulation, ESSO and then Counsel engaged in a strategy of delay and evasiveness to hinder the agreed to site assessment of the property. The assessment at the Esso's property did not commence, until November 9, 1993, and only after I ordered the parties to comply. This compliance came more than one year after the Order of Agreement; and only after numerous conferences, court hearings, Orders and Extensions concerning this subject with the Magistrate; an aborted show of compliance which, in turn, generated several motions to compel. Absent the concealment of the documents in the Agrelot files and the Esso Defendants and then counsel success in burying the December 1989 testing event in excess of 10,000 documents,[16] the waste of resources by the parties and this court with respect to discovery at the ETSS site would not have occurred. It is beyond dispute that both Esso, through its personnel, and the Law Firm had knowledge of the course of conduct at the ETSS site of emptying the contents of the oil/water separator into the toilet, and of the testing event indicating contaminants in high and/or substantial concentrations around the area of the holding tank. Nonetheless, both Esso and then counsel, not only continued to deny the presence of CHCs contaminants, but acted with deliberation to hinder the plaintiffs and the other litigants from conducting their own discovery for CHCs at the ETSS site.

Further, the April 1991 submissions to the EPA support the reasonable inference that the concealment of the Agrelot files and the December 1989 testing event were but one link in the strategy to prevent or delay investigation of the ETSS site. Through Geraghty & Miller, Respondents claimed to the EPA that "the CERCLA citation is unwarranted" because "there is no evidence to suggest that the Esso Tutu service station has released or contributed chlorinated organic compounds to the environment." Exh. 18.

---

[16] In his responsive brief, Eugenio Romero, states that "the bulk of the documents produced in response to the first document production request [] exceeded 10,000 documents." Memorandum of Eugenio Romero at p. 20.

Conspicuously absent from the numerated testing and reports considered for this claim was the December 1989 sampling event and the documents in the Agrelot files. Attorney Francis Torres, on April 29, 1991, submitted a response to the EPA, certified by Ms. Ana Gloria Ramos of Esso, basically affirming the claim contained in the Geraghty & Miller April 5, 1991 letter. Responses Numbers 6 and 8, based on the testimony and admissions at this proceeding, are factually false and misleading.[17] Responses 9, 13, and 14

---

[17] The Esso entities, in their "Response for Information Under 42 U.S.C. § 9604," certified to the EPA through Ana Gloria Ramos, in a letter by counsel, Francis Torres, the following:
REQUEST NO. 6
If oil changes were conducted at the facility, please give an annual summary explaining how the used oil was disposed of, the quantity disposed of per month and any and all analysis of this used oil. Please provide all appropriate documentation. If any such document is not available, please describe the document and explain why it cannot be provided.
RESPONSE NO. 6
Used oil handling, management and storage practices were conducted at the ETSS by Mr. Daniel Bayard who is the person with specific knowledge of those practices. Esso has knowledge of the common practice of service station operation in the U.S. Virgin Islands to provide the used oil generated at the stations' mechanics shops for energy recovery to the Water and Power Authority of the Virgin Islands until such time that the regulations applicable to such operations become effective. ESSO is also aware of off-site disposal by Safety Kleen Environmental Company, Inc. of the used oil generated at the service station in the U.S. Virgin Islands, which may include the ETSS.
According to Mr. Bayard, approximately 75 gallons of used oil were generated at the service station as a result of oil changes. The used oil was removed by gravity into a 5 gallon storage cart with a capture funnel on top. The used oil was then stored at a 2,000 gallon storage tank located at the ETSS. Subsequently, the used oil was removed by the local government (V.I. Department of Energy) for usage at the WAPA power plant. The used oil was also removed and transported off-site for disposal by Safety Kleen Envirosystems, Inc.
Mr. Bayard maintains that he has no records of the instances in which the used oil was removed and transported off-site. Nor are there records of analysis, if any, of the used oils.
REQUEST NO. 8
Is there, or has there ever been, any means by which fluids or sludge can escape or be discharged from any oil and water separator (i.e., an open overflow valve or pipe) that presently exists or existed at the facility?
RESPONSE NO. 8
In 1986 a pipe was constructed by EDACO to connect the water phase of the separator into a sewer line located in the parking lot of the Four Winds Shopping Center behind the ETSS. Pursuant to the information provided by Mr. Eugenio de Arce of EDACO and Mr. Daniel Bayard, liquids from the oil/water separator were not discharged through this connection as the pipe was immediately eliminated and capped by EDACO.
The oil and water separator is designed, constructed and operated to prevent the escape or release of the substances which are stored therein. According to informa-

compounded the denials made in Responses 6 and 8, of any knowledge of discharge or discharges of oil from the oil/water into the environment. These denials were made under oath, despite all the parties' knowledge of Mr. Bayard's practice of pouring the "fluids" from the separator into the toilet. It is no wonder that Mr. Bayard had no documentation of how he disposed of "fluids and sludge" from the oil/water separator. These submissions to the EPA were drafted or certified by, and copied to, among others, Ms. Ana Gloria Ramos, Jose Cepeda, Esq., Francis Torres, Esq., and Jose Agrelot. Esso production of these April 1991 communications to the EPA in discovery, supports the reasonable inference that one of the aims of its campaign with the EPA was first, to induce reliance by the parties and this tribunal on the accuracy and truthfulness of the statements to the EPA, and as a consequence of such reliance, to prevent or delay discovery as to the Esso Tutu site. The parties relied on the truthfulness of this claim to the EPA and, clearly were prejudiced significantly by this strategy.

 Under the applicable legal rules the parties' reliance was not unreasonable. As the Third Circuit Court of Appeals has noted:

> The Federal Rules themselves recognize the reliance aspect of discovery, permitting parties to request information inadmissible at trial where such request is "reasonably calculated to lead to the discovery of admissible evidence. See FED. R. CIV. P. 26(b)(1). Discovery could not serve the function of triggering subsequent inquiry if parties were not entitled to rely on the results obtained at each step. See Rozier v. Ford Motor Co., 573 F.2d 1332, 1345 (5th Cir. 1978)('Our system of civil litigation cannot function if parties . . . suppress information called for upon discovery.")

Averbach v. Rival Mfg. Co., 879 F.2d 1196, 1201 (3d Cir. 1989). After noting the reliance aspects of the "deposition-discovery process established by Rules 26-37" the Third Circuit court explained, that "[b]ecause the Federal Rules of Civil Procedure are structured to

---

tion provided by Mr. Bayard, there has never been an overflow of liquids at the oil/water separator. The oil from the separator was transferred manually into a used oil storage tank located at the premises and the water was also transferred manually and discharged into the sanitary line.

elicit truthful answers given under oath, an opposing party, in [certain] circumstances . . ., may reasonably rely on interrogatory answers." Averbach, 879 F.2d at 1201. As such, an adverse party "cannot be faulted for failing to pry by further discovery into the very same inquiry aborted by [a party's] misleading answer." Id.

█ Here, the evidence suggests that the omission of any reference to December 1989 testing event and the documents in the Agrelot files in the April 1991 communications to the EPA was deliberate rather than negligent or inadvertent. A reasonable inference is that the April 1991 letter by the TEIC consultant, Geraghty and Miller,[18] was just another attempt by Esso and its then Counsel to delay and/or hinder discovery in this matter. Indeed, it can be cogently argued that the letter was a calculated attempt not only to mislead the EPA, but also to mislead the other litigants and this tribunal. See infra, V. Though the court recognizes that it was the client, through current counsel, that unearthed the files, and as such took a substantial step in correcting the wrong, this act did not erase the previous wrong, and the prejudice flowing therefrom.

██ It is clear that in this matter, prejudice to all parties derives, in the first instance, from the expense incurred as a result of the concealment of the documents in the Agrelot files. In light of the late disclosure of these documents, it becomes apparent that Respondents objections to the site investigation were interposed improperly. The numerous delays, extensions of time, and objections raised as to witnesses[19] and the scope of the investigation, resulted in a waste not only of the parties' limited resources and time, but in a considerable waste of judicial resources. The Magistrate devoted several days to a separate contempt hearing with respect to the Respondent's non-compliance with the January 15,

---

[18]The court is deeply concerned by the apparent misuse by the Esso entities of its relationship with Geraghty and Miller with respect to the submission to the EPA. See, supra, n. 6, and infra n. 26. By using Geraghty and Miller in this manner, Esso may have compromised the reliability and credibility of the studies and reports of the TEIC consultant—studies and reports conducted over a period of years and for which, as of October 1993, over $1.65 million dollars were expended by Texaco, alone.

[19]The Magistrate has issued numerous admonitions both oral and written against the ESSO defendants, and their then Counsel. Indeed in the Orders dated October 23, 1991, and November 18, 1992 (appealed and affirmed by this judge), fees and costs were assessed against the Esso Defendants for discovery abuses.

1993 Order. The time spent carefully reviewing this record by this court and its staff is also considerable. The importance of these documents cannot be argued. It was vital if not critical evidence that was withheld from both the parties and the local and federal agencies for more than two years, while the investigation for source or sources of the contamination to the aquifer was ongoing. That Esso and then counsel abused the discovery process is beyond question.

█ The evidence also establishes that the tactics engaged in by Respondents, both counsel and client, for several years in the litigation of this case, were calculated to frustrate and exhaust the opposition. The testimony received by this court and the Movants in their memoranda of law, chronicle this history of dilatoriness. Whether masterminded or led by then Counsel, with the acquiescence of the client, Respondents' campaign in this litigation was one of misdirection, delay, oppressive pleadings, expense and harassment.

█ Such an abuse of the discovery process is antithetical to the proper functioning of our system of justice. This court notes that one of the cornerstones of our adversarial system of justice "is access of all parties to all evidence bearing on the controversy between them, including that in control of adverse parties." Litton Systems, Inc., v. American Tel & Tel. Co., 91 F.R.D. 574, 576 (S.D.N.Y. 1981). Imperative to the proper functioning of our system of justice is "complete and accurate responses to discovery" requests. Averbach v. Rival Mfg. Co., 879 F.2d 1196, 1201 (3d Cir. 1989) (citing Rozier v. Ford Motor Co., 573 F.2d 1332, 1346 (5th Cir. 1978) (stating that "It is axiomatic that discovery by interrogatory requires candor in responding," (alterations in original)). As such "destruction or concealment by a party of relevant documents in its files threatens the viability and public acceptance of the system." Litton Systems, 91 F.R.D. at 576. Prejudice to the parties and this tribunal is not a question, but an issue of degree. The only question remaining concerns what sanctions are appropriate to compensate the aggrieved parties and to vindicate the court's authority for the discovery abuses found in this proceeding.

## V. MOVANTS' SPECIFIC SANCTION REQUESTS

A. *Four Winds Plaza Partnership*:

Movant Four Winds requested, as just and appropriate, the imposition of the following sanctions:

1. An award of costs and attorney's fees against ESSORICO, ESSOVI, ESSOSA [the "Esso Defendants"], and the law firm of Goldman Antonetti, Attorneys Jose A. Cepeda and Francis Torres, pursuant to Rules 11, 26(g) and 37(b) and (d).

2. An award of excess costs, expenses and Attorney's fees against Goldman Antonetti, Attorneys Jose A. Cepeda and Francis Torres, pursuant 28 U.S.C. § 1927.

3. An award of all fees incurred in this litigation, as well as the funding of a medical evaluation and monitoring program, pursuant to the court's inherent power against [the Esso Defendants], and Goldman Antonetti, Francis Torres and Jose A. Cepeda.

B. *Ramsay Motors*:

Specifically, Movant Ramsay Motors seeks:

1. Dismissal of Esso's Third-Party Complaint for contribution and response cost pursuant to 42 U.S.C. § 1907, the CERCLA Act. Pursuant to this claim, Ramsay seeks an award of its reasonable expenses, including expert consultant fees and attorney fees incurred in the defense of Esso's claims, as authorized by Rule 37(b) and the court's inherent powers.

2. An award of reasonable expenses incurred, (a) in its efforts to identify possible sources of PCE contamination in the area around ESSO TuTu, (b) to counter ESSO's campaign to have the EPA reverse its March 1990 CERCLA citation, and (c) in connection with these fact-finding hearing proceedings, including, but not limited to costs, expert consultant fees, and attorney's fees, pursuant to Fed. R. Civ. P. 26(g) and 11.

3. An order, pursuant to 28 U.S.C. § 1927, assessing excess costs, expenses, and attorney's fees against G & A attorneys personally, for those expenses incurred by Ramsay as a result of their conduct; and

4. Such other relief that the court deems just and proper under the circumstances.

## C. *L'Henri, Inc.:*

Movant L'Henri, Inc. seeks the following sanctions:

1. Dismissal of the Esso Defendants' cost recovery claim for contribution against L'Henri.

2. An award of costs and expenses and reasonable attorney fees, incurred as a result of the misconduct.

## D. *Western Auto Supply Company:*

Movant Western Auto Supply Company ("WASCO") joins and adopts the arguments of Texaco, Inc., and L'Henri, Inc. for a finding of contempt and sanctions. WASCO makes the following specific arguments:

1. That it was served with the Esso Defendants' Third-party Complaint after February 1993;

2. That the Third Case Management Order in effect at the time required the Esso Third Party Plaintiffs to provide WASCO, as a new party, with "copies of all responses provided by original parties to requests for production of documents";

3. That in response to a written request for document production dated April 6, 1993, legal counsel for the Esso Defendants at the time, again omitted the documents in the Agrelot files;

4. That Esso's Attorney Romero, however, produced for WASCO a statement which purportedly was provided to the U.S. EPA which stated, in response to a November 6, 1987 inquiry from EPA, at page 7, Bates No. 901032 that: "No hazardous or regulated substances are disposed of."

5. That Esso's Attorney Romero, also, produced the following response made to the EPA, which stated:

There were or are no hazardous or regulated substances regulated under CERCLA, or hazardous wastes regulated under RCRA ever used, stored, generated, disposed or otherwise handled at the service station. (Pages 9-10, Bated Nos. 901034-35)

297

Defendant Western Auto Supply Company's Motion For Sanctions Against the Esso Defendants, pp. 2-3.

6. That the documents not produced in response to WASCO's request, when contrasted with those which were, demonstrate that the Esso Defendant's response to the request for documents was not only misleading, but willfully false.

7. Finally, WASCO argues that "the conduct of the Esso Defendants so transcends the duty of candor," that the only appropriate sanction is an order permanently barring the Esso Defendants from raising a claim for recovery of any costs under CERCLA.

### E. *All other Parties:*

All other parties to this litigation have, through oral advocacy at the hearings on these proceedings, argued for the imposition of sanctions for the discovery misconduct of the Esso Defendants and then legal counsel.

## VI. SPECIFIC SANCTIONS

██ Because the court has found that the conduct here was not the result of inadvertence or mere oversight, but was intentional and in bad-faith, it need not "eschew the harshest of sanctions" available to it under Rule 37 or its inherent power. Cine v. Allied Artists, 602 F.2d at 1068. Indeed, "the full range of sanctions may be marshalled" including dismissal of claims and departure from the American Rule, which prohibits fee-shifting in most cases. Id., See also, Nasco v. Chambers, 111 S.Ct. at 2133-34.

### A. *Monetary Awards*

██ All the movants attorneys' fees and costs incurred in connection with all depositions, discovery motions, hearings and conferences related to the parties attempt to obtain evidence as to releases from and/or presence of chlorinated hydrocarbons on the Esso Tutu Service Station site, investigation costs incurred as a result of the concealment of the documents in the Agrelot files, and attorneys fees and costs incurred in the Fact Finding Hearing in this matter may be capable of recovery by movants.

## B. *Dismissal of Claims*

All the Movants sought dismissal of the Esso counter- and/or cross-claims for contribution. Four Winds settlement of its suit against the Esso Defendants moots its requests for attorney's fees and costs. However, its request for dismissal of the Esso Defendant's counter-claim for contribution remains viable. Movants Ramsay and L'Henri, Third-Party Defendants, were joined to this action by the Esso Defendants. The Esso Defendants assert a CERCLA cost recovery claim against Ramsay and L'Henri. Specifically, Movant L'Henri argues, that since "a CERCLA cost recovery action between private parties is an equitable action for contribution," citing Smith Land and Improvement Corp., v. Celotex Corp., 851 F.2d 86, 90 (3d Cir. 1988), cert. denied, 488 U.S. 1029, 102 L. Ed. 2d 969, 109 S. Ct. 837 (1989), the concealment and pattern of discovery abuses in this case warrant dismissal of the Esso Defendants' equitable claim.

█ Dismissal as a sanction is within the discretion of the court. And as noted earlier, dismissal is a drastic measure — the most severe of civil sanctions that may be imposed for dilatory conduct and other discovery violations. Moreover, because "dismissal constitutes a denial of access to justice, . . . it should . . . be resorted to only to the minimum extent necessary to induce future compliance and preserve the integrity of the system." See Litton, 91 F.R.D. at 576. However, where as here, past counsel with the knowledge and apparent acquiescence of the client have flouted their obligations under the rules and their responsibility to this court, sanctions are clearly warranted. The aggrieved parties argue for dismissal. Since the court has found serious misconduct in this matter, it will consider whether dismissal of the equitable cross-claims and counterclaims for contribution is a reasonable and appropriate sanction.

██ When considering dismissal as a sanction for counsel's misconduct, the court is required to give notice to the party against whom dismissal is being sought. See Dunbar v. Triangle Lumber & Supply Co., 816 F.2d 126, 129 (3d Cir. 1987). This is to ensure that the client is given the opportunity to defend against the consequences of the attorney's misconduct, since a litigant chooses counsel at his peril, and the misconduct of counsel may lead to the

dismissal of the litigant's claim. See Link v. Wabash Railroad Co., 370 U.S. 626, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962). However, because Of the possibility of a client's unawareness of its counsel misconduct, courts, generally, are reluctant to visit the sins of the attorneys upon the heads of their clients by dismissing valid and meritorious claims. But where, as here, the client's complicity in the "acts and omissions" of its chosen counsel has been established clearly, sanctions for the discovery abuses may be assessed against the client, independently, and not merely through attribution of counsel's misconduct. Indeed, in this case, it was current legal counsel for the clients who brought the concealed Agrelot files to light, and who was given the opportunity to, and did defend fully the clients' position in this matter.

■ Before deploying the severe sanction of dismissal pursuant to Rule 37 or its inherent power, this Circuit's precedent requires a district court to weigh and consider certain factors. Those factors were identified by the Third Circuit Court of Appeals in Poulis v. State Farm Fire and Cas. Co., 747 F.2d 863, 868 (3d Cir. 1984), and are as follows:

> (1) the extent of the *party's* personal *responsibility*; (2) the *prejudice* to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) *history* of dilatoriness; (4) whether the conduct of the party or the attorney was *willful or in bad faith*; (5) the effectiveness of other sanctions other than dismissal, which entails an analysis of *alternative sanctions*; and (6) the meritoriousness of the claim or defense.

Poulis, 747 F.2d at 868. All six factors need not weigh against the intransigent party for the court to find that dismissal is warranted. In light of the extensive factual findings, supra at Part V, the court will only discuss these factors to the extent not touched upon before.

1. *Application of the Poulis Factors*

a. *Responsibility of the Party*

■ The record clearly establishes the client's personal responsibility for the failure to comply with the discovery requests and

300

this court's Order. Though it has been argued that the clients acted upon advice of counsel, the record is replete with evidence of the client's knowing participation in the strategy to delay and hinder discovery in this case.[20]

### b. *Prejudice to the Adversary*

██ Any further discussion of prejudice serves only to amplify the court's earlier findings. The court has found that the adversaries in this case were hampered significantly in pursuing their claims and defenses against the Esso Defendants. Purposeful and deliberate concealment of evidence raise a rebuttable presumption that "'the innocent party's interest in pursuing the full and fair litigation of its claims'" has been prejudiced. See Anderson v. Cryovac, 869 F.2d at 925, quoting National Association of Radiation Survivors v. Turnage, 115 F.R.D. 543, 557 (N.D. Cal. 1987). The presumption may be refuted by clear and convincing evidence that withheld material was immaterial. Here, this burden has not been met. Moreover, under the Poulis analysis, prejudice need not be "irremediable," and may consist of excess costs incurred as a result of the dilatory conduct or discovery violations. See Curtis T.

---

[20] *Ana Gloria Ramos*: It was Ms. Ramos who retained Agrelot to conduct the December testing on an expedited basis. Ms. Ramos submitted and gained approval for the testing which deviated from the usual bidding procedures. Ms. Ramos' justification was that the testing was needed before December 22, 1989 to substantiate ESSO's objections to the EPA. The record reflects several discussions on the preliminary results on the sampling sent by ETC involving Ana Gloria Ramos. Less than three (3) months after the January 23, 1990 strategy session on this matter, Ana Gloria Ramos certified for Esso the response to the Total Vision Interrogatory Requests, yet she "omitted" mention of this "urgent" study. Ms. Ramos also certified responses for Esso to the EPA which, albeit a year later, repeated this non-disclosure. Ms. Ramos' actual knowledge of the study and the documents retained by Agrelot, and thus fault for the repeated non-disclosure of these documents, is imputed to her employer, the Esso Defendants.

*Jose Blanco*: Knowledge of and fault for the non-production of the documents are also imputed to the client by virtue of the conduct of Mr. Blanco, Vice President of Operations and Administration for ESSORICO, member of the Board of ESSORICO and ESSOVI, and Chairman of TEIC. Blanco was present at the first strategy session of January 23, 1990 when Agrelot discussed his report. Jose Blanco testified he discussed the information received from Agrelot with respect to the December 1989 test sampling with his immediate supervisor Mr. C. Stuart Griffith, President of ESSORICO and ESSOVI. Blanco acknowledged that he must have reviewed the April 5, 1991 letter from Geraghty and Miller to the EPA on behalf of ESSO, but claimed he did not recall the December 1989 testing event or the documents retained by Agrelot to correct any misleading allegations. In any event, Blanco claimed he relied on the advice of counsel as to the position taken with the EPA.

Bedwell & Sons v. International Fidelity Ins. Co., 843 F.2d 683, 693 (3d Cir. 1988).

### c. *History of Dilatoriness*

The parties' scheme to harass and oppress the opposition, and hinder discovery in this case was not limited to the concealment of Agrelot files, but extended to the conduct surrounding the pipe tracing and anomaly investigation at the Esso Tutu Service Station.[21] As documented in the proceedings from that motion to compel, even where the parties acknowledged their discovery obligations, as with the August 7, 1992 consent agreement to discovery at its site, these parties acted to hinder such discovery for more than six months. Even then, on January 19, 1993, the scheduled day of the site inspection, when all parties and their experts were standing by, Respondents resisted discovery. It required a telephone conference that day with the Magistrate, culminating with a verbal order compelling the Esso Defendants to go forward with the inspection as per the court's order of January 15, 1993, before there was a show of compliance. As noted in Part I of this Memorandum Opinion, despite the court's express order, the inspection was nonetheless aborted. The record supports the inference that this particular noncompliance was but one of the more egregious examples of Respondents' campaign to hinder and delay discovery in this action.

The record shows that the court was required to referee every aspect of discovery involving these particular litigants.[22] The pattern of delay also includes the misleading and evasive responses to opposing party's interrogatories and the EPA, in light of information actually and constructively known to, and in the possession of, then counsel and the client. Delay was incurred

---

[21] The court does not overlook in its findings that the Esso Defendants, through the efforts of current counsel have compensated Plaintiffs Four Winds and L'Henri for the cost suffered in bringing the motions to compel the "anomaly" investigation.

[22] In particular, Movant L'Henri points to, and argues that the ESSO Defendants' untimely "Urgent Motion for a Protective Order" with respect to deposition of Mr. Guswa, was made only to harass and inconvenience plaintiffs. The motion was denied, ultimately, by the Magistrate, but not before great expense and delay had been incurred in litigating its merits. This, movants argue, is but one of many examples of the strategy of delay undertaken by Esso and its then counsel.

when Respondents produced witnesses, pursuant to Rule 30 (b)(6), so ill-prepared and lacking in knowledge that the Magistrate ordered the retaking of the depositions at these parties' expense. Then counsel's response was typical of the bad-faith and intransigency manifested throughout this action. Attorney Cole responding to a letter from counsel for Four Winds regarding the terms of the Order to retake the deposition, stated—"Ms. Moody: Re: Your letter of today. You suffer from delusions of integrity."[23] That this action has been characterized by consistent delays by the Esso Defendants' past counsel is beyond peradventure.

### d. *Willfulness or Bad Faith*

██ The court has found that Respondents, both the clients and the individual attorneys, acted willfully or purposefully and, at times, in bad faith. The court will briefly clarify the willfulness issue as it relates to the client. First, the Esso Defendants' first-hand knowledge of the December 1989 testing event and custody of the documents in the Agrelot files have been clearly established. Yet, as was shown, less than four months after the testing event, after several discussions in the interim on the very subject matter, Ms. Ana Gloria Ramos certified responses in this case, omitting references to the testing. Ms. Ramos' explanation for the repeated non-disclosure of this evidence is two-fold. In the first instance she claims to have acted on advise of counsel, and in the second, she suffered a memory loss as to these events. The same argument is made by Ms. Ramos' immediate supervisor, Mr. Blanco, who is also charged with first-hand knowledge of the information. Blanco claims to have prepared a presentation, including charts on the December 1989 testing event for the hierarchy in his organization, namely Mr. J. S. Simon and Mr. C. Stuart Griffith. Blanco stated he was unable to make the presentation, but that he gave the prepared materials to Mr. Simon. In this case Ms. Ramos principally, and Blanco as her supervisor, were charged with reviewing the truthfulness and accuracy of responses in this action. They both testified that they relied on counsel in the preparation of the responses that

---

[23] Attorney Cole's display of improper Conduct during this litigation was dealt with in a separate Memorandum and Order.

they certified to this court. Without questioning the veracity of this averment, it is clear that this failure to review the responses was in dereliction of duties and obligations to this court and the parties, of which they were clearly aware. As one court remarked, courts "will not allow a party sentiently to avoid its obligations by filing misleading or evasive responses, or by failing to examine records within its control." Cryovac, 862 F.2d at 929. Moreover, what later transpired with Geraghty & Miller with respect to the EPA evidences deliberate decision making by Ms. Ramos and Blanco for their employer. Indeed, the apparent manipulation of the TEIC environmental consultants to stymie discovery in this action, supports an independent finding of "willfulness" and or bad faith on the part of the client.

e. *Alternative Sanctions*

██ ██ Under Poulis the court is required to consider the effectiveness of a lesser penalty short of dismissal. In addition to monetary sanctions, as in an award of fees and costs, alternative sanctions as set forth under Rule 37(b)(2)(A), include, the designating of facts to be established, refusing to allow the disobedient party to support or oppose designated claims or defenses, prohibiting the party from introducing designated matters in evidence, the striking of pleadings, or staying further proceedings. As noted previously, monetary sanctions have been imposed for several prior acts of misconduct with no apparent deterrent effect. Respondents simply paid the sum and continued to disregard their obligations under the rules and as ordered by this court. Nor does it appear that any of the lesser penalties enumerated above would be effective or practicable under the circumstances of this case. For instance, as to Movant Four Winds, the common law claims are settled, and only the equitable claim for contribution by the Esso Defendants remain. The Esso Defendants remaining cross-claims against Movants L'Henri and Ramsay Motors are also equitable claims for contribution under CERCLA. With the exception of the PID/HARTMAN plaintiffs, the claims that may be asserted by and against the other party litigants aggrieved by the delays and other misconduct would be for contribution under CERCLA and RCRA. For the court to impose any of these lesser penalties, as in deeming

certain facts as established, in this instance to hold as established Esso's responsibility for any or all presence of CHCs' in the Tutu aquifer, would be to place a disproportionate burden on the Esso Defendants for the clean-up costs of this superfund site far beyond their misconduct in this case. Moreover, such a broad presumption would not direct the sanction to the particular abuse that has occurred in this action, since it fails to consider the clinical data concerning the migratory paths of particular contaminants. The alternative, a more limited order with respect to certain evidence, would require time-intensive parsing of the empirical or clinical data developed over the last seven years. In order to make the determination as to what facts to be deemed established or which defenses or claims to prohibit, the court would have to engage its own expert to conduct its own testing or to analyze the mountainous data extant in this complex environmental case. It is obvious that such an order would not only further tax the court's scarce resources and perpetuate the harm, inherent in any delay, to the aggrieved parties, but would in effect be a dismissal of the asserted claims for contribution. An award of the full cost of litigation incurred by the aggrieved parties to date would be inappropriate and unworkable for similar reasons. It appears then, that the imposition of any of the enumerated lesser sanctions would engender further delay, and would in effect be no less harsh than dismissal.

### f. *Meritoriousness of the Claims*

 For purposes of determining whether dismissal is the most appropriate sanctions, "[a] claim . . . will be deemed meritorious when the allegations of the pleadings, if established at trial, would support recovery . . . or would constitute a complete defense. Poulis, 747 F.2d at 869-70. As to Movant Four Winds, the Esso Defendants' counterclaim is based on two allegations: first, there allegedly was a discharge of contaminated water from the Four Winds Cistern sometime after September 1990; and secondly, Four Winds allegedly had installed or operated underground storage tanks ("USTs") for the storage of certain hazardous materials. The allegations involving a release of water from the cistern after September 1990, by definition could not cause or contribute to the

305

contamination discovered to exist in 1986. The allegations which referenced the USTs simply do not state any failure of the tanks' integrity, nor do they identify any mechanism of release. Therefore, even if the allegations, as asserted, were established at trial, they would neither constitute a complete defense, nor support recovery against Four Winds.

The Esso Defendants in their cross-claim against Ramsay Motors make similar assertions to those raised in the counterclaim against Four Winds Plaza in relation to USTs, and as such the complaint suffers from the same deficiencies. As with the allegations against Four Winds, the complaint fails to allege any failure of the integrity of the Ramsay tanks or any mechanism of release. Thus, on the face of the amended third-party complaint it may be determined, that even if all the allegations are established at trial, they would not support recovery or establish a complete defense against Ramsay Motors.

In contrast to the allegations against Four Winds and Ramsay Motors, the assertions in the amended third-party complaint against Movant L'Henri, Inc. rest on stronger factual grounds, in that the complaint identifies a mechanism for release of contaminants by L'Henri. Specifically, the complaint states at paragraph 16:

> Upon information and belief on, at least one occasion during 1986, as a result of the willful and/or negligent act of third-party defendant, an employee at O'Henry, disposed of and released hazardous substances on the site, upon which the dry-cleaning business is located.

Amended Third-Party Complaint Against L'Henri, Inc., at p.3.

■ Accordingly, under a liberal application of the above standard, which is essentially "that of a dismissal for failure to state a claim on which relief can be granted." Andrews v. Government of the Virgin Islands, 25 V.I. 284, 132 F.R.D. 405, 413 (D.V.I. 1990), only the Esso Defendants' cross-claims against L'Henri are clearly "meritorious."

■ The court notes at this point, the additional argument of Movants Ramsay Motors and L'Henri, and as specifically adopted by WASCO, that a private litigant's recovery of CERCLA response

costs is conditioned, in large measure, on equitable considerations. See Smith Land & Imp. Corp. v. Celotex Corp., 851 F.2d 86, 90 (3d Cir. 1988) (remarking that "CERCLA expressly conditions the amount of contribution on the application of equitable considerations"). Thus, the allocation of response costs under CERCLA may be increased or decreased, in the discretion of the court, after relevant equitable considerations are taken into account. Among the factors of equity taken into consideration when determining the allocation of response costs is "the degree of cooperation of the parties with government officials to prevent any harm to the public health or the environment." See Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 672-73 (5th Cir. 1989). Movants L'Henri and Ramsay Motors argue that the deliberate and willful concealment of evidence of environmental contamination from the EPA is not only "uncooperative conduct," but may be properly characterized as actively impeding government efforts to protect the public health and the environment.

Movants cite Folino v. Hampden Color & Chemical Co., 832 F. Supp. 757 (D. Vt. 1993),[24] where a similar failure to disclose information regarding environmental contamination was found to be sufficiently egregious to bar completely a private party's CERCLA claim for contribution. Movants argue that Respondents' deliberate concealment of the scientific evidence of PCE contamination at the ETSS site, may have resulted in the continued migration of the contamination off-site via groundwater, to other areas. Such migration may have led to an increase in the extent of the contamination, resulting in a corresponding increase in response and clean-up costs. Movants point out the fact that the non-disclosure or concealment is even more egregious because it was repeated several times in almost four years, while hundreds of thousands of dollars were paid to consultants to identify and

---

[24] In Folino a lessee hired an environmental consultant and discovered that the property it had leased was contaminated. The lessee did not disclose the existence of the contamination, either to the lessor or the appropriate government agency. It was not until six years later when the lessee corporation was sold, that the consultant's report was disclosed to the lessor, who then advised the appropriate state environmental agency. Both lessee and lessor incurred CERCLA costs. However, the lessee's claim for contribution against the lessor was denied, based on its decision to conceal the existence of the contamination. Folino, 832 F. Supp. at 764.

clean-up the source or sources of PCE contamination in the Tutu aquifer. Movants conclude that because it is highly probable that the Esso Defendants would be barred from obtaining contribution under CERCLA once allocation costs are assessed, any sanction which does not include dismissal of these equitable claims would not compensate them for the harm incurred and would simply delay this result.

g. *Summary of the Factors* ·

The court recognizes and commends current lead counsel for the Esso Defendants, Robert T. Lehman, Esq., of the Archer & Greiner law firm, for taking this action out of its frozen state and for bringing about compliance with the discovery Rules and court orders. However, this fact does not absolve the client of its substantial responsibility for the earlier discovery abuses, nor does it erase the harm caused to the aggrieved parties.

■ In this matter the first five factors support dismissal of the claims for contribution against all movants. As to Movants Four Winds and Ramsay Motors, all six factors weigh in favor of dismissal. On balance, the weighing of the Poulis factors, appears to compel dismissal of the equitable claims of Respondents. The court is nevertheless mindful of the fact that dismissal is disfavored and that in cases involving a pattern of attorney delay, an award of monetary damages is "the most direct and therefore preferable sanction." Poulis, 747 F.2d at 863. However, the justification is not compelling where prior monetary damages have been imposed against Respondents with little or no deterrent effect, where the acts of misconduct include the concealment of evidence, and where, as here, the client bears responsibility for the acts of misconduct. See National Hockey League, 427 U.S. 643, 96 S. Ct. at 2781. See also, C. T. Bedwell & Sons v. Intern. Fidelity Inc. Co., 843 F.2d 683, 695-696 (3d Cir. 1988). Moreover, the court cannot overlook the Supreme Court's admonition that sanctions must be weighed in light of the full record in the case. National Hockey League, 427 U.S. at 646.

■ Our judicial system cannot bear the burden of its courts having to referee every document request, as this court has in this matter. With respect to discovery at the Esso Tutu Service Station

site, countless conferences with the Magistrate did not bring about compliance; it took the intervention of this Magistrate to bring about the inspection of this site, almost two years later. The pattern of misconduct here spawned several motions for contempt and the imposition of sanctions. Disposing of these motions necessitated the court carving out several days for the receipt of testimony in a jurisdiction where judicial time and resources are scarce and over-burdened. In addition, the court has expended countless hours sifting through the resulting record, motions and relevant case law. Such a misuse of valuable court time also deprives litigants, outside of this case, of an opportunity to be heard. Here, the history of delay and oppressive pleadings is well documented. Indeed, as the evidence unfolded during the hearings on this matter, this court was moved to comment that "there is a real, real history here, and the history is not good." 10/29/93 Tr. at 69. Respondents' strategy of litigation not only unduly burdened the opposition and increased exponentially the litigation costs and time in this case, but resulted in a gross waste of judicial resources. Monetary sanctions alone will not suffice to vindicate the court's authority and compensate the aggrieved parties for the prejudiced suffered.

## VII. ATTORNEYS' SANCTIONS

██ ██ The court concludes that the attorneys in control of the litigation at the time, as officers of the court, whether actually or specially admitted to this bar, breached their duty of honesty and candor to the tribunal. Even where the litigation stakes are high and personalities conflict, as in the instant matter, attorneys must be vigilant not to cross the fine line between zealous advocacy and mendacious conduct. The court expects, and the rules of professional responsibility require, attorneys to fulfill their duty of candor to the court and to be truthful in disclosures to their adversary. An attorney's signature on a document that is misleading is a serious breach of this affirmative duty. An attorney certifies by his signature on pleadings and other documents filed with the court that:

> to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances

309

[that the filing] is not being presented for any improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation; that the denials of factual contentions are warranted on the evidence or, if specifically so identified are reasonably based on lack of information or belief.

See Fed. R. Civ. 11 (B). Aside, from the suppression of evidence, it appears that the tactic, here, was to burden the opposition, to exhaust their resources and thus impair their ability to fully present their case. This was big league litigation in the small community of the Virgin Islands. However, the campaign, calculated to strain to exhaustion opposing parties' litigation time and resources, also burdened the resources of the court which are at a premium. Respondents' repeated non-disclosure, under the circumstances presented here, constitutes an abuse of the process, clearly violative of the mandate of the Rules, in effect at the time.

█ Moreover, the evidence suggests that the nondisclosure became the root of a strategy to impede discovery as to the ETSS site. As the trial judge stated in Nasco, Inc. v. Calcasieu Television and Radio, 124 F.R.D. 120, 143 (W.D.La 1989), there is no place in modern litigation practice for "trial by ordeal." More significantly, these Respondents, the Attorneys, admitted to practice before this court, owed a separate and independent duty of good faith and candor to the court and the public. In failing to make truthful and responsive disclosures in documents filed in this matter, they violated this continuing duty. "The power of the court to punish attorneys as officers of the same, for misbehavior in the practice of the profession" is unassailable. See Nasco v. Calcasieu, 124 F.R.D. at 140, citing Ex Parte Bradley, 74 U.S. (7 Wall) 364, 19 L. Ed. 214 (1869). In upholding the sanction of "fee shifting" imposed by the trial court in Nasco v. Calcasieu, the Supreme Court recognized that such an award is clearly within the court's power, if it is to punish the parties conduct during the litigation and/or to vindicate the court's authority over a recalcitrant litigant. Chambers v. Nasco, U.S. , 111 S.Ct. at 2137.

Movants are clearly entitled to an award of fees and costs reasonably incurred in proving the misconduct alleged in this matter and in applying for relief from the court for Respondents'

failure to cooperate in discovery. The record evidences the numerous discovery abuses by Respondents, and Movants have shown that as a result of Respondents' dilatory tactics and misleading responses, the cost of litigation in this case was increased substantially.

 Under its inherent power and pursuant to 28 U.S.C. § 1927, this court, in its discretion may award costs and fees to the aggrieved parties and assess against the attorneys the excess costs incurred as a result of the misconduct in this case. The court recognizes that since it did not receive evidence on the amount of damages suffered as a result of the misconduct in this case, it is constrained to a discussion of the sanctions that are legally appropriate and not the exact amount of the awards.

Sanctions will be imposed against those attorneys, who the record discloses had knowledge, actual or constructive, of the December 1989 testing and of the documents held by Agrelot in his files, and who actively participated in the litigation of this matter. Specifically, as to the individual attorneys, the record reveals, as follows:

*Francis Torres*: Partner in law firm of Goldman Antonetti. He submitted the April 29, 1991 responses to the EPA that were false and misleading. From the testimony and evidence introduced at the hearing, Torres appears to have controlled the litigation strategy in this case. He knew the testing was being conducted; he received the preliminary results from ETC on December 21, 1989, and the record indicates he discussed these testing results that day with Agrelot, Jose Cepeda of his firm, and Ana Gloria Ramos of Esso. Torres prepared the "Privileged and Confidential" agenda for the January 23, 1990 meeting and was present at the May 3, 1990 strategy conference where the documents and results were the topic of discussion. He is charged with knowledge of the April 1990 interrogatory response to the Total Vision Request for Production. Torres never moved to correct or supplement this response even though he must have known it contained critical omissions. Torres allowed this 'concealment' or 'non-disclosure' of documents to be repeated, thereby thwarting subsequent attempts to obtain the information. Torres was copied with and worked with Geraghty & Miller on the misleading submission certified by Ana Gloria Ramos to the EPA.

*Jose Cepeda*: Head of the environmental department of Goldman Antonetti. Although Cepeda's involvement was less extensive than that of Torres, his responsibility to the court and opponents was no less clear. He was charged with knowledge of the testing event, because of his receipt on December 21, 1989 of the ETC preliminary results. Cepeda was named as attending the first strategy session on January 23, 1990 with respect to this testing event, and where Agrelot was directed to keep the documents in his files. Though Cepeda claims to have no memory of this meeting, the record produced for this hearing belies this claim.

*Eugenio Romero*: Partner with law firm of Goldman Antonetti. He was placed in charge of the litigation aspect of the Tutu case. Romero, who formally appeared in the Virgin Islands case in late 1989, was in charge of directing or responding to the discovery requests. It was Romero who produced the ETC reports which were misdated as January 11, 1989 and not 1990, and which were designated as responsive to testing in the Tutu area. It was through Romero's claimed "inadvertence" that this map and summary, which he admits was necessary and relevant, were not disclosed; yet, other similar type summaries were included with the over 10,000 documents produced. Romero also claimed to have confirmed and reviewed with Ana Gloria Ramos personally the discovery responses of the client, meaning that the misleading disclosures were actually prepared by Romero. Gross professional negligence in the discovery process is equally inexcusable as willful misconduct. See Cine Forty-Second Street, 602 F.2d at 1068. Indeed, Romero and local counsel Warren Cole were the principal actors in carrying out the strategy of delay, and it was for their acts of misconduct that prior monetary sanctions were assessed against the client.

*Warren B. Cole*: Local Virgin Islands counsel for the Esso entities. Cole participated in the May 3, 1990 strategy session with Torres, Cepeda, Romero and Agrelot which he memorialized. Although he cannot be charged with the initial non-disclosure of the documents in the Agrelot files, Cole acceded to the "wait and see" strategy adopted at the May 3, 1990 meeting. Moreover, Cole together with Mr. Romero, carried out the strategy of delays and harassment of the opposition. (See supra, footnotes 22, 23 and discussion on the

30(b)(6) discovery abuses and other motions for sanctions specifically against Attorney Cole).

*Otto Bustelo*: In-house counsel for ESSORICO, ESSOVI, and the Esso CCD division. Undeniably, Bustelo, and thus the client, had knowledge of the December testing and the documents retained by Agrelot. However, the hearing revealed that Bustelo's role in this campaign appears to have been minimal. To the extent that Bustelo knew of the concealed documents, he had a duty, as an officer of the court, to counsel his employer and client to obey the discovery demands.

## VIII. DETERMINATION OF SANCTIONS

 The court concludes that the imposition of sanctions is warranted against the Esso Defendants and their former counsel, the law firm of Goldman Antonetti Cordova Axtmayer, Francis Torres, Esq., Eugenio Romero, Esq. and Jose A. Cepeda, Esq. To make a determination as to the nature and extent of sanctions warranted by Respondents' misconduct, the court is scheduling a hearing on this matter for June 26, 1995. However, the court will afford the Esso Defendants and their former counsel the opportunity to negotiate with the Movants, prior to the hearing date, a mutual resolution of the monetary claims only. The court will consider Movants' equitable claims for sanctions, i.e. dismissal of claims, and will also make a final determination on such claims after the June 26, 1995 hearing.

An appropriate order will be entered.

## ORDER

AND NOW in accordance with the reasons set forth in the court's Memorandum Opinion dated this date and filed herewith,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT pursuant to Rules 11, 16 and 37 of the FED. R. CIV. P. and the court's inherent power, sanctions are warranted against the Esso Defendants, ESSOSA, ESSORICO and ESSOVI, and the law firm of Goldman Antonetti Cordova & Axtmayer, and Francis Torres, Esq., Eugenio Romero, Esq., and Jose A. Cepeda, Esq., for the discovery violations found in this proceeding; and

313

IT IS FURTHER ORDERED that a hearing be scheduled on June 26, 1995 at 10:00 a.m. at the District Court of the Virgin Islands, St. Thomas, for a determination as to the nature and extent of sanctions warranted by Respondents' misconduct; and

IT IS FURTHER ORDERED that the Esso Defendants and their former counsel are hereby given the opportunity to negotiate with the Movants, prior to the hearing date, a mutual resolution of the monetary claims only; and

IT IS FURTHER ORDERED that the court will also make a final determination on Movants' equitable claims for sanctions, i.e., dismissal of claims, and disciplinary action against the attorneys, after the June 26, 1995 hearing.

IT IS SO ORDERED.